**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HELEN ARMSTRONG,
*Plaintiff-Appellant*,

v.

TERRY REYNOLDS; STEVE GEORGE;
JESS LANKFORD; LARA PELLEGRINI,
*Defendants-Appellees.*

No. 20-15256

D.C. No.
2:17-cv-02528-
APG-DJA

OPINION

Appeal from the United States District Court
for the District of Nevada
Andrew P. Gordon, District Judge, Presiding

Argued and Submitted May 3, 2021
Seattle, Washington

Filed January 13, 2022

Before: Danny J. Boggs,[*] A. Wallace Tashima, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

---

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed in part and reversed in part the district court's dismissal of plaintiff's claims brought pursuant to 42 U.S.C. § 1983 and Nevada state law against four state officials arising from plaintiff's termination from her workplace, Ear Nose and Throat Associates, after she filed complaints with the Nevada Occupational Safety and Health Administration regarding unsafe medical practices at her workplace.

After attempting without success to raise her concerns with her employer, plaintiff Helen Armstrong filed a complaint with the Nevada Occupational Safety and Health Administration (NOSHA). Nevada law supports and encourages such reporting by prohibiting retaliation against whistleblowers who report health and safety hazards. Nev. Rev. Stat. § 618.445. Armstrong alleges that Ear, Nose and Throat Associates (ENTA) retaliated against her, leading her to return to NOSHA to file a second complaint. But when Armstrong withdrew the whistleblowing complaint for fear of further retaliation—before ENTA learned of it—NOSHA notified ENTA about the complaint and, Armstrong alleges, more retaliation followed. When she filed a third whistleblowing complaint, NOSHA scuttled any investigation. Eventually, ENTA fired Armstrong.

The panel first reversed the dismissal of Armstrong's procedural due process claim. The panel held that even

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

though Armstrong conceded that she was an at-will employee, Nevada law has created limited exceptions to at-will employment and protections for whistleblowers that can support a property interest in continued employment. Although the panel agreed with defendants that Armstrong had not plausibly alleged that their conduct as state actors caused her to be fired, citing *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978), the panel noted that the information contained in Armstrong's briefing suggested that she might be able to plausibly allege a relationship between the defendants and her termination sufficient to sustain either a "direct participation" or "setting in motion" theory. Accordingly, the panel held that Armstrong must be granted leave to amend her complaint.

The panel next considered Armstrong's contention that, in addition to interfering with her right to continued employment by causing her to be fired, defendants deprived her of a property interest in being reinstated by failing to investigate her retaliation complaint, as they were obligated to do under Nevada law. The panel agreed with Armstrong that Nevada's statute created a property interest beyond continued employment, but not that that interest extended to reinstatement. Thus, the panel held that the district court erred in holding that Armstrong did not have a property right in the investigation of her whistleblowing complaint because § 618.445 creates a protected property interest in an investigation and in an action brought in court on behalf of those whose claims have merit. The panel further determined that the complaint plausibly alleged that the process Armstrong received was essentially nonexistent and so constitutionally deficient. The panel concluded that with respect to the due process claim, Armstrong demonstrated a protected property interest in an investigation and to some degree, in continued employment.

The panel agreed with the district court that Armstrong had not sufficiently alleged a substantive due process claim based on a liberty interest. Thus, Armstrong had not plausibly alleged that she was unable to pursue an entire occupation, nor did the complaint allege any facts supporting the calculation of 13 years of lost future employment, or otherwise suggest that defendants' actions entirely precluded Armstrong's ability to work as a human resources professional elsewhere. Accordingly, the panel held that the district court did not err in dismissing Armstrong's substantive due process claim and denying Armstrong leave to amend her complaint.

Addressing the negligent infliction of emotional distress claim—that NOSHA official Lara Pellegrini negligently notified plaintiff's employer about her complaint—the panel held that the district court erred in concluding that the claim was subject to Nevada's discretionary function immunity statute. Applying the *Berkovitz-Gaubert* test, the panel held that Pellegrini had offered no cognizable social, political, or economic reason for her allegedly negligent action. Finally, the panel held that the district court did not err in dismissing Armstrong's civil conspiracy claim as barred by the intracorporate conspiracy doctrine, but that the district court abused its discretion in dismissing the claim without leave to amend.

**COUNSEL**

Phillip Spector (argued), Messing & Spector LLP, Baltimore, Maryland; Noah Messing, Messing & Spector LLP, New York, New York; John Napier Tye, Whistleblower Aid, Washington, D.C.; for Plaintiff-Appellant.

Jeffrey Morgan Conner (argued) and Vivienne Rakowsky, Deputy Assistant Attorneys General; Office of the Attorney General, Las Vegas, Nevada; for Defendants-Appellees.

**OPINION**

BERZON, Circuit Judge:

Helen Armstrong witnessed unsafe medical practices in her workplace, Ear Nose and Throat Associates (ENTA). After attempting without success to raise her concerns with her employer, Armstrong filed a complaint with the Nevada Occupational Safety and Health Administration (NOSHA). Nevada law supports and encourages such reporting by prohibiting retaliation against whistleblowers who report health and safety hazards. Nev. Rev. Stat. § 618.445.

Armstrong alleges that ENTA did retaliate against her, leading her to return to NOSHA to file a second complaint against ENTA. But when Armstrong withdrew the whistleblowing complaint for fear of further retaliation—before ENTA learned of it—NOSHA notified ENTA about the complaint and, Armstrong alleges, more retaliation followed. When she filed a third whistleblowing complaint, NOSHA scuttled any investigation. Eventually, ENTA fired Armstrong.

Armstrong sued four Nevada state officials in their individual capacities under 42 U.S.C. § 1983, alleging that the officials violated her substantive and procedural due process rights and further alleging violations of both state and federal statutes and regulations. She also brought Nevada state law claims for civil conspiracy, intentional and negligent infliction of emotional distress, fraud, and malfeasance, misfeasance, or nonfeasance in office. The district court dismissed all the claims.

Armstrong now appeals the dismissal of her due process, negligent infliction of emotional distress (NIED), and civil conspiracy claims. We reverse the dismissal of Armstrong's procedural due process and NIED claims, affirm the dismissal of her substantive due process claim, reverse the district court's denial of leave to amend some of her claims, and remand for further proceedings.

## I.

Helen Armstrong worked as a supervisor in human resources at ENTA. She had been with the company for twenty-three years at the time of these events. In February 2014, Armstrong and a coworker filed whistleblower complaints with NOSHA against ENTA, describing unsafe practices, including the use of contaminated syringes and sale of expired prescriptions. NOSHA investigated ENTA and issued citations and fines for various health and safety violations. But, Armstrong alleges, instead of simply paying

the fines and fixing the violations, ENTA began retaliating against the whistleblowers.[1]

Shortly after NOSHA opened its investigation, Armstrong was removed from her role as a supervisor and demoted. Following the close of NOSHA's investigation, Armstrong began to receive workplace write-ups and complaints. Before Armstrong acted as a whistleblower, no co-worker complaints had been filed against Armstrong in her twenty-three years at ENTA; fifty were filed after the investigation.

On May 30, 2014, Armstrong lodged a complaint with NOSHA alleging illegal retaliation for her earlier whistleblower filing. Shortly after that, Armstrong was diagnosed with cancer. Worried about the loss of her health insurance if she lost her job and concerned about facing further retaliation once ENTA was informed of her new complaint, Armstrong discussed her options with case investigator Michael Ybarra and decided to withdraw her claim. Ybarra made note of this conversation in

---

[1] Our factual account follows Armstrong's First Amended Complaint (FAC), which is presumed true for present purposes. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

Both parties in this case attached exhibits to their briefing on the motion to dismiss and referred to those exhibits in their briefs before this court. The district court granted Defendants' motion to dismiss without addressing the material outside the pleadings or converting the motion into one for summary judgment under Federal Rule of Civil Procedure 56. Our recitation of the facts in this case and our review of the district court's order is therefore limited to the contents of the complaint and "evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

Armstrong's file and specified that Armstrong made the decision to withdraw to protect herself from retaliation, noting that "her employer had not been notified of the complaint." (Capitalization simplified.)

But, on June 24, 2014, NOSHA's Chief Investigator Lara Pellegrini copied ENTA on a letter to Armstrong acknowledging the withdrawal. Armstrong alleges that Pellegrini admitted to others at NOSHA that sending the letter copy to ENTA was a "mistake"; Pellegrini says she sent the letter to ENTA because she was "[f]ollowing a template letter from the OSHA manual." Either way, instead of the quiet end to the complaint process Armstrong had hoped would help her keep her job and health insurance, NOSHA informed an allegedly retaliatory employer that its employee had continued to report violations of the law but had given up on seeking redress. After ENTA learned of the new complaint, Armstrong alleges, the retaliation she experienced increased.

Armstrong met with Pellegrini on July 24, 2014, expecting an apology. Pellegrini instead insisted she had made no mistake, as she was required to send ENTA the letter copy. The next day, Armstrong was "physically ill and mentally destroyed" and so requested an additional day of leave on top of her previously scheduled medical leave. When she returned to work on Monday, July 28, 2014, she was berated in front of her office colleagues and patients and accused of violating company policy and lying about having been ill the prior week. The first of several disciplinary write-ups followed. Later that day, Armstrong was hospitalized and required a heart stent implant.

Armstrong filed another retaliation complaint on August 14, 2014. She was fired from ENTA on November 17.

Armstrong alleges that NOSHA's investigation of her last complaint was effectively shut down by the Defendants, acting in concert, through foot-dragging and subterfuge. This sequence of events began on April 1, 2015, when Ybarra sent ENTA a letter notifying it of Armstrong's amended complaint to NOSHA, in which she alleged that her disciplinary write-ups and termination were retaliatory. In the letter, Ybarra requested that ENTA provide a statement responding to the allegation and any supporting documentation, including personnel records, within 10 business days. Two days after Ybarra sent the letter, Pellegrini reassigned the case to herself and thereafter requested documents from Armstrong; Pellegrini never followed up on the documents previously requested from ENTA. When Armstrong objected to Pellegrini's assignment of the case to herself, Jess Lankford, NOSHA Chief Administrative Officer and a defendant in this case, reassigned the case to a new investigator, Rick Lucas. But Pellegrini continued to be involved with the case after being replaced: she met with ENTA's attorney and corresponded with ENTA about the status of the case, without copying Armstrong on correspondence or otherwise communicating with her.

According to Armstrong, other NOSHA officials also blocked investigation of her case: Terry Reynolds, Deputy Director of the Nevada Division of Business and Industry, and Steve George, Administrator of the Division of Industrial Relations, ordered investigators not to communicate with her. Also, ENTA made a settlement offer but NOSHA never told Armstrong about it. And, on July 16, 2015, Lucas was ordered by Lankford, Reynolds, and George to "stand down"—apparently meaning entirely suspend—the investigation, but Armstrong was never told that the investigation was not going forward. From July until

November 2015, Armstrong and her representative continued to reach out to Lucas and Lankford but received no information about the status of the investigation or why it had stopped.

On November 18, 2015, Lucas was allowed to restart the investigation. Lucas again requested the documents—first requested in April by Ybarra—that ENTA had never provided. He then prepared a subpoena ordering ENTA to provide documents supporting their decision to terminate Armstrong. ENTA did not meet the deadline set for producing the documents, but Lankford and George blocked Lucas's requests to issue the subpoena for the documents. In the end, NOSHA never received any documentation from ENTA supporting their allegations about Armstrong's misconduct.

On December 10, 2015, ENTA's attorney emailed NOSHA a copy of an indictment filed against Armstrong for obtaining controlled substances by fraud or forgery. According to the FAC, ENTA's attorney acknowledged that the criminal charges—which were eventually dismissed— were irrelevant to the whistleblower investigation. Nonetheless, and despite Lucas's protests, Reynolds and George directed that Armstrong's file be closed. On February 4, 2016, Lucas turned the file over to Pellegrini without signing the final report. He then resigned in disgust.

Armstrong received a letter closing her case. She alleges that, after that, her representative was denied access to relevant documents in the investigation file.

The FAC alleges that Reynolds, George, Lankford, Pellegrini, and unnamed Nevada state officials violated her rights under 42 U.S.C. § 1983, the Due Process Clause, and the Occupational Safety and Health Act, and committed

various state law violations. The district court granted Defendants' motion to dismiss. The court (1) dismissed Armstrong's procedural due process claim without prejudice and her substantive due process claim with prejudice, holding that she failed to allege a property interest in her continued employment because she was an at-will employee; (2) dismissed Armstrong's state-law negligence claims, including her claim for negligent infliction of emotional distress, with prejudice, on the basis that the defendants were entitled to discretionary-function immunity; and (3) dismissed Armstrong's state-law civil conspiracy claim with prejudice, holding that her claim was barred by the intracorporate conspiracy doctrine because it alleged a conspiracy between members of the same agency.[2]

Armstrong then filed a motion for leave to file a second amended complaint. The motion was reviewed by a magistrate judge, who recommended denying it. The district court adopted the recommendation and dismissed the case with prejudice. Armstrong timely appealed.

## II.

The Due Process Clause "forbids the governmental deprivation of substantive rights without constitutionally adequate procedure." *Shanks v. Dressel*, 540 F.3d 1082, 1090–91 (9th Cir. 2008). "A section 1983 claim based upon procedural due process . . . has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of

---

[2] The district court also dismissed the remainder of Armstrong's claims, which are not at issue in this appeal.

process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).

The district court addressed only the first element of Armstrong's procedural due process claim, holding that "given her concession that she was an at-will employee," Armstrong "cannot state a valid cause of action for violation of procedural due process because she has not alleged a constitutionally protected liberty or property interest." Armstrong contends that Nevada law has created limited exceptions to at-will employment and protections for whistleblowers that can support a property interest. We agree.

## A.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972). Key to a property interest determination is whether the person alleging a due process violation has an entitlement to the benefit at issue, conferred through statute, regulation, contract, or established practice. Property interests "are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577.

Transposing these general precepts to the current context, our question is whether an employee of a private entity can acquire a limited property interest in continued employment, protected against government interference

without due process, through the enactment of state laws restricting the circumstances in which an otherwise at-will employee may be disciplined or discharged.  Our case law establishes that, in appropriate circumstances, she can.

*Merritt v. Mackey*, 827 F.2d 1368 (9th Cir. 1987), addressed a procedural due process property-based claim of that ilk.  In *Merritt*, a counselor working at a private nonprofit corporation alleged that federal and state officials forced his termination without a hearing by requiring that he be fired as a condition of government funding for the nonprofit. *Id.* at 1370.  *Merritt* held "[i]t . . . indisputable that an individual may have a protected property interest in private employment." *Id.*  But to bring such a claim, the plaintiff "must show that [she] had more than a 'unilateral expectation' of continued employment; [she] must demonstrate a 'legitimate claim of entitlement.'" *Id.* at 1371 (quoting *Roth*, 408 U.S. at 577).

Elucidating the "legitimate claim of entitlement" concept in the context of private employment, we have held that "[i]f under state law, employment is at-will, then the claimant has no property interest in the job." *Portman*, 995 F.2d at 904.  In other words, if an employee can be fired for any reason at any time, she has at most only a unilateral expectation of continued employment.  But—critically, for present purposes—state laws can limit at-will employment, even for employees who do not have employment contracts assuring continued employment or limiting the circumstances in which they can be disciplined or discharged. *See Merritt*, 827 F.3d at 1371.  And "when a private employee is deprived of his employment through government conduct, the cause of action available to the employee is not merely the right to sue for interference with

contractual relationships"; the employee can bring a due process claim against the government. *Id.*

Armstrong contends that Nevada's protection against discharge or discipline for safety and health whistleblowers creates, even for otherwise at-will employees, a "legitimate claim of entitlement" in retaining a job without being fired for a prohibited reason. It does.

Nevada has created exceptions to at-will employment that apply to all employees in the state. Relevant here is Nevada's protection of employees from being fired for whistleblowing about health and safety issues: "A person shall not discharge or in any manner discriminate against any employee because the employee has filed any complaint or instituted or caused to be instituted any proceeding" under the state's Occupational Safety and Health chapter. Nev. Rev. Stat. § 618.445(1). Nevada also recognizes a common law tort cause of action for discharge against an employer who "terminat[es] an employee for reasons that violate public policy," including termination for whistleblowing. *Allum v. Valley Bank of Nev.*, 114 Nev. 1313, 1316–17, 1320 (1998). An employee's status as an otherwise at-will employee does not affect either the statutory or the common law protection. *Id.* at 1317; *see* Nev. Rev. Stat. Ann. § 618.445. So although—absent a contract to the contrary—employers in Nevada are free to fire employees for almost any reason at any time, they may not discharge an employee for reporting workplace hazards to the appropriate authorities.

This protection, albeit limited, creates a legitimate entitlement to protection from negative employment consequences for making OSHA complaints, and so a property interest. In general, "[a] law establishes a property interest in employment if it restricts the grounds on which an

employee may be discharged." *Hayward v. Henderson*, 623 F.2d 596, 597 (9th Cir. 1980) (quoting *Maloney v. Sheehan*, 453 F. Supp. 1131, 1141 (D. Conn. 1978)). *Hayward* pointed to a provision permitting discharge only for "just cause" as an "example," of a protection creating "a right to continued employment." *Id.* (quoting *Maloney*, 453 F. Supp. at 1141). By specifying a "just cause" provision as an "example" of a broader category of job protections giving rise to a property interest in continued employment, *Hayward* indicated that laws more narrowly creating restrictions on discharge could create a property right in employment free from a discharge violating that restriction.

*DiMartini v. Ferrin*, 906 F.2d 465 (9th Cir. 1990), *amending* 889 F.2d 922 (9th Cir. 1989), reiterated that suggestion, specifically noting that Nevada's public policy exceptions to at-will employment may create a limited property interest. *DiMartini* concerned a *Bivens* action against an FBI agent who allegedly instigated DiMartini's discharge from private employment because DiMartini refused to cooperate with an FBI investigation. *See* 889 F.2d at 923. Addressing qualified immunity, *DiMartini* held that it was clearly established law that an employee has a "right to be free from unreasonable government interference with his private employment" but remanded to the district court the question whether DiMartini had adequately alleged a property right to support his due process claim. 906 F.2d at 466–67. In a footnote, *DiMartini* explained that "[t]his court has held that state law can create a constitutionally significant property interest in private employment," and noted that:

> "Nevada . . . recognizes that an at-will employee has at least a limited right to

> continued employment because he cannot be terminated when the purpose of the termination offends public policy." *See Hansen v. Harrah's*, 100 Nev. 60, 675 P.2d 394 (1984) (Nevada adopts a public policy exception to at-will employment rule and recognizes a tort action for retaliatory discharge resulting from employee filing of worker's compensation claim).

*Id.* at 467 n.4. Although, as Defendants correctly note, *DiMartini* did not squarely determine "whether [a property] interest existed *in that case*," the *DiMartini* footnote does follow the reasoning of *Merritt* and *Hayward* in indicating that when the state restricts, broadly or narrowly, the grounds upon which an employee can be discharged, the state may establish a property interest in continuing employment without being discharged for an impermissible reason. (Emphasis added.)

Squarely addressing the question *Merritt*, *Hayward*, and *DiMartini* left (barely) open, we now hold that Nevada's statutory and common law protections for whistleblowers create a limited property interest for plaintiffs who plausibly allege that they have been illegally terminated for health and safety whistleblowing. Nevada law gives employees more than a unilateral expectation that they will be able to keep working without a retaliatory discharge. Nevada's OSHA statutes and case law prohibit employers from firing employees for properly reporting OSHA violations or otherwise exercising their NOSHA statutory rights. Nev. Rev. Stat. § 618.445(1); *Allum*, 114 Nev. at 1316–17. All Nevada employees who avail themselves of those rights are provided a legitimate entitlement, established by the state,

not to be fired for those actions, and so have a property right in continuing employment if they do exercise those rights.

This property interest is narrower than the interest held by an employee with a contract assuring continued employment for a specified time period or establishing that discharge must be for cause. But limited property interests in employment are not new. *Federal Deposit Insurance Corp. v. Henderson*, 940 F.2d 465 (9th Cir. 1991), for example, determined that an employment contract that provided for at-will termination with a ninety-day notice requirement, or for-cause termination with no notice, created a property interest "limited to ninety days of employment." *Id.* at 470 n.8, 476. The limited nature of the interest may, of course, affect the calculation of damages. And any plaintiff claiming such a property interest must plausibly allege the other elements of any procedural due process claim: a deprivation of that interest by the government and a lack of process. *Portman*, 995 F.2d at 904. But the restricted nature of a governmental or contracted limitation on employee discipline or discharge does not destroy the prospect of *any* property interest in continued employment.

**B.**

Defendants acknowledge that the state offers protections to whistleblowers that extend to otherwise at-will employees but maintain that Armstrong was not entitled to those protections. Armstrong, Defendants argue, has not made a plausible showing that she was fired because she complained about health and safety violations, as "Armstrong had numerous workplace problems." Defendants' argument fails.

Under Nevada law, a plaintiff alleging tortious discharge for whistleblowing "must demonstrate that his protected

conduct was *the* proximate cause of his discharge," rather than establishing mixed motives for the discharge (which suffices for some purposes under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and other statutes). *Allum,* 114 Nev. at 1319–20; 42 U.S.C. § 2000e-2(m). But Armstrong is not relying on a mixed motives theory.

The records the Defendants bring forward to demonstrate that ENTA had cause to fire Armstrong, are the very write-ups Armstrong alleges were pretextual and so part of the retaliation for whistleblowing she experienced. She alleges that these write-ups were generated to create the appearance that there was cause to fire her when there was not, pointing to the fact that she had not previously received any write-ups in twenty-three years of employment and that the first write-up was based on an alleged incident nine days after NOSHA concluded its initial health and safety investigation. On a motion to dismiss, taking Armstrong's factual allegations in her complaint as true, the presence of allegedly pretextual reasons for firing do not defeat the plausibility of Armstrong's allegation that her termination was retaliatory.

## C.

Our conclusion that Armstrong had a property interest in continued employment without discipline or discharge for properly exercising her rights as a whistleblower does not end our analysis. Defendants also contend that we should affirm the district court's dismissal of Armstrong's claim because she has not satisfied the second element of a § 1983 procedural due process claim, "a deprivation of the interest by the government." *Portman*, 995 F.2d at 904. Defendants assert that even if Armstrong can show that "ENTA retaliated against her, thereby creating a legitimate claim to

continued employment," she has not plausibly alleged that their conduct caused the deprivation of that interest. On this point, we agree with Defendants.

The cases that established that government interference in private employment could give rise to a procedural due process claim all involved deliberate efforts by government actors to cause the plaintiffs to be fired. In *Merritt*, the government officials conditioned funding for the private employer on its firing of the plaintiff. 827 F.2d at 1370. In *DiMartini*, DiMartini alleged that the government official subjected his employer to "threats, harassment and intimidation" to cause DiMartini's firing. 889 F.2d at 926. But these cases do not set forth a general standard for when government interference in private employment rises to the level of a due process violation.

Defendants propose a test derived from state action doctrine. They contend that Armstrong must show "conduct of state actors exercising 'coercive power' or 'such significant encouragement, either overt or covert, that the choice [to fire Armstrong] must in law be deemed to be that of the state.'" *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999). Armstrong disagrees, contending that we should apply this court's precedents establishing liability under § 1983, in which the "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)).

We agree with Armstrong that the *Johnson* framework applies here. Unlike the plaintiffs in *Sullivan*, who brought

a § 1983 claim against private insurers, 526 U.S. at 47–48, Armstrong brought her claim directly against the state defendants. Defendants give no basis for applying cases determining whether private action could be attributed to the state when Armstrong has not sued the private actors in this case.

Armstrong alleges that Defendants caused her termination through their actions in the period from the Pellegrini letter up to and including the termination itself. But even under the more flexible standard of *Johnson*, Defendants are correct that Armstrong has not plausibly alleged in the FAC that they caused her firing. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The only specific action the FAC alleges Defendants affirmatively took *before* Armstrong's termination was Pellegrini's copying of ENTA on the withdrawal letter, thereby alerting ENTA to Armstrong's first whistleblower retaliation complaint. Armstrong contends that Pellegrini's letter "set[] in motion all of the retaliation to follow" and so caused the deprivation of her property interest. But Armstrong states that the letter was "mistakenly sent," and the letter is the basis for Armstrong's negligent infliction of emotional distress claim. Armstrong's position, in other words, is that the letter was sent negligently. "Where a government official's act causing injury to life, liberty, or property is merely negligent, 'no procedure for compensation is *constitutionally* required.'" *Daniels v. Williams*, 474 U.S. 327, 333 (1986) (citation omitted). Armstrong has thus not plausibly alleged that she was

deprived by intentional actions of the Defendants of her interest in continued employment free from retaliation as a whistleblower.

In her briefing, Armstrong maintains that, following Pellegrini's mistake, Defendants "colluded with ENTA to interfere in the whistleblower investigation to secure her termination." In support of this point, Armstrong's briefs rely primarily on evidence not included in the FAC. She quotes, for example, from Ybarra's declaration that he "firmly believe[s]" that Armstrong was terminated "on either approval or encouragement" of Defendants. This assertion is not in the FAC at issue in this motion to dismiss; in fact, the declaration Armstrong cites was not signed until July 2019, after she filed her proposed Second Amended Complaint.

Generally, though, plaintiffs should be granted leave to amend their complaints unless "it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma County*, 708 F.3d 1109, 1118 (9th Cir. 2013) (quoting *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991)). If Armstrong can allege facts sufficient to show that Defendants coordinated with ENTA in the period after Pellegrini's letter but before Armstrong's termination, such acts may be sufficient to sustain either a "direct participation" or "setting in motion" theory under *Johnson*. The information referred to in the briefing suggests that Armstrong may possibly be able to plausibly allege such a relationship between the Defendants and ENTA's termination of Armstrong. Accordingly, we hold that Armstrong must be granted leave to amend her complaint.

**D.**

In addition to her contention that Defendants interfered with her right to continued employment by causing her to be fired, Armstrong maintains that the statutory protections Nevada affords to whistleblowers create a property interest in reinstatement in their jobs, and that the Defendants deprived her of that interest by failing to investigate her retaliation complaint, as they were obligated to do under Nevada law. We agree with Armstrong that Nevada's statute creates a property interest beyond continued employment, but not that that interest extends to reinstatement.

(1) We begin by noting that, in contrast to the allegations Armstrong made regarding her termination, Armstrong has plausibly alleged that Defendants took direct actions to prevent any investigation of her final complaint and so to preclude filing suit on her behalf. Armstrong represents that Pellegrini and others in NOSHA took actions designed to cover up their mistake of alerting ENTA to her further whistleblowing. The FAC includes factual allegations that, despite the efforts of two different NOSHA investigators, Defendants prohibited any collection of evidence from ENTA regarding Armstrong's NOSHA complaint. In particular, the FAC alleges that Pellegrini never followed up to obtain the documents from ENTA initially requested by Ybarra, and that George prevented Lucas from issuing an already-prepared subpoena for those same documents months later. And for the four months the investigation was technically open, the FAC further states, Lankford and George instructed Lucas not to investigate at all, without informing Armstrong that the investigation was suspended.

The question before us, then, is whether NOSHA's alleged conduct in failing to pursue Armstrong's claims deprived her of a protected property interest. "[N]ot every

statute authorizing a benefit creates a property interest." *Doyle v. City of Medford*, 606 F.3d 667, 672 (9th Cir. 2010). "Whether an expectation of entitlement is sufficient to create a property interest 'will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the [decisionmaker].'" *Allen v. City of Beverly Hills*, 911 F.2d 367, 370 (9th Cir. 1990) (alteration in original) (quoting *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980)). "[I]f the statute sets out conditions under which the benefit *must* be granted or if the statute sets out the *only* conditions under which the benefit may be denied," then the statute creates an entitlement to the benefit sufficient to create a property interest. *Id.* (quoting *City of Santa Clara v. Andrus*, 572 F.2d 660, 676 (9th Cir. 1978)). But "[i]f 'the decision to confer a benefit is unconstrained by particularized standards or criteria, no entitlement exists.'" *Id.* (internal quotation marks omitted) (quoting *Fidelity Fin. Corp. v. Fed. Home Loan Bank*, 792 F.2d 1432, 1436 (9th Cir. 1986)).

Nevada Revised Statutes § 618.445 prohibits retaliation against whistleblowers for their communications to NOSHA and provides that "[a]ny employee aggrieved by a violation of [that prohibition] may file a complaint." *Id.* § 618.445(1)–(2). The statute goes on:

> 3. Upon receipt of the complaint by the Division, the Administrator shall cause such investigation to be made as the Administrator deems appropriate. If upon investigation, the Administrator determines that the provisions of subsection 1 have been violated, the Administrator shall bring an action in the name of the Administrator in any appropriate

district court against the person who has committed the violation.

4. If the court finds that the employee was discharged or discriminated against in violation of subsection 1, the employee is entitled to reinstatement and reimbursement for lost wages and work benefits.

*Id*. § 618.445(3)–(4). Although the statute does provide for reinstatement of an unlawfully discharged employee, the agency cannot grant reinstatement directly. Instead, the agency is directed to investigate the complaint and bring an action in court on behalf of an aggrieved employee, seeking a judgment that would include reinstatement and reimbursement. In that action, an employee is "entitled to reinstatement" only "*[i]f* the court finds that the employee was discharged or discriminated against in violation of subsection 1." *Id*. § 618.445(4) (emphasis added). So the entitlement to reinstatement is, from the agency's point of view, contingent and not within its direct control.

(2) At the same time, the statute does require NOSHA to investigate complaints and, if violations are found, file suit to remedy the violations, including seeking reinstatement. Can that mandatory obligation provide Armstrong with a property interest in the agency's conducting the required investigation and litigation? Yes, it can.

Again, property interests "may take many forms," *Roth*, 408 U.S. 564, 576, and "the types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact,'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) (quoting *Nat'l Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582,

646 (1949) (Frankfurter, J., dissenting)). Neither party before us has cited any cases considering whether provisions requiring actions to be brought by the government created property interests.

We have previously noted some tension in this court's case law on when a cause of action itself constitutes a property interest for the purposes of a due process claim. *See In re Nat'l Sec. Agency Telecomms. Recs. Litig.*, 671 F.3d 881, 899 n.4 (9th Cir. 2011). The Supreme Court has held that "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan*, 455 U.S. at 428. But this court has stated that statutes *precluding* certain causes of action do not violate the Due Process Clause, because "a party's property right in any cause of action does not vest until a final unreviewable judgment is obtained." *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1086 (9th Cir. 2001) (emphasis omitted) (quoting *Grimesy v. Huff*, 876 F.2d 738, 743–44 (9th Cir. 1989)).

We need not resolve that tension here to determine whether Armstrong's interest in NOSHA's treatment of her complaint is cognizable. The Nevada statute at issue does not create a cause of action for employees in Armstrong's position, allowing *them* to bring claims against their employers. Instead, the statute establishes a process by which the government agency is required to investigate and, if merited, bring the action on the employee's behalf. Nev. Rev. Stat. § 618.445(3). That benefit is separate from the potential viability of the cause of action itself, and so from a potential final judgment of reinstatement. The benefit provided by § 618.445 is that the time, money, and legal expertise required to bring a claim in court will be provided by the government, not the employee herself. Unlike the cause of action itself, that benefit accrues regardless of the

final outcome of the court case, and so exists before judgment is obtained and regardless of whether the judgment is favorable. *Cf. Lyon*, 252 F.3d at 1086. The form of benefit created by this statute is certainly of value within the "whole domain of social and economic fact." *Logan*, 455 U.S. at 430 (quoting *Nat'l Mut. Ins. Co.*, 337 U.S. at 646 (Frankfurter, J., dissenting)).

(3) To determine whether this benefit is a property interest protected by the Due Process Clause, we must assess "the extent to which the statute contains mandatory language that restricts the discretion of the [decisionmaker]." *Allen*, 911 F.2d at 370 (alteration in original) (quoting *Jacobson*, 627 F.2d at 180). In the circumstances before us, § 618.445 does create such a protected property interest in an investigation and in an action brought in court on behalf of those whose claims have merit.

This inquiry turns primarily on an assessment of the language of § 618.445. When interpreting state statutory language, federal courts are ordinarily bound by the decisions of the given state's highest court. *Ariz. Elec. Power Co-op., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir. 1995). But if that court has not yet spoken on the issue at hand, "[o]ur task" is to "predict" how that court would decide the issue. *Platt v. Moore*, 15 F.4th 895, 901 (9th Cir. 2021) (citing *Alliance for Prop. Rights & Fiscal Resp. v. City of Idaho Falls*, 742 F.3d 1100, 1102 (9th Cir. 2013)).

Here, however, the Nevada statute at issue repeats, almost verbatim, the federal OSHA enforcement statute, which similarly mandates that the Secretary "*shall* cause such investigation to be made as he deems appropriate" and "*shall* bring an action" if the statute is violated. 29 U.S.C. § 660(c) (emphases added). This parallelism is no accident. Federal law requires that, for a state OSHA plan to receive

approval from the federal reviewing body, it must be "at least as effective in providing safe and healthful employment and places of employment as" the federal OSHA statute. 29 U.S.C. § 667(c); *see also, e.g.*, *AFL-CIO v. Marshall*, 520 F.2d 1030, 1033 (D.C. Cir. 1978). Nevada lawmakers therefore likely included the relevant statutory language regarding investigation and litigation of retaliation claims into the state's OSHA plan to assure that the plan would be at least as effective as the federal version and, accordingly, receive federal approval.

The NOSHA statute's legislative history provides support for this supposition. Joint hearing reports issued by the Nevada Senate's Commerce and Labor Committee and the Nevada Assembly's Labor and Management Committee indicate that the relevant language was added into the NOSHA statute in 1975 at the direct behest of the federal reviewing body. *See* Nev. S. Com. & Lab. Comm. & Nev. Assemb. Lab. & Mgmt. Comm., Rep. on J. Hearing 233, 253 (1975) (indicating that the addition of § 618.445 was "required" by a "[f]ederal legislative review letter"); Nev. S. Com. & Lab. Comm. & Nev. Assemb. Lab. & Mgmt. Comm., Rep. on J. Hearing 138, 189 (1975) (same). Thus, both the *language* and the *substance* of § 618.445 were transplanted from federal law, rendering this dispute essential one of interpreting the meaning of the federal statute.

We are aware of three federal court of appeals decisions that weigh in on the meaning of the "shall" language in § 660(c), the federal OSHA statute's whistleblower provision. In *Wood v. Dep't of Lab.*, 275 F.3d 107 (D.C. Cir. 2001), the plaintiff claimed that the Secretary of Labor had determined that his employer violated § 660(c), but then "unlawfully declined to file suit." *Id.* at 109–10. The district

court dismissed the complaint on the ground that the Secretary's decision not to bring suit on behalf of the plaintiff was not judicially reviewable. *Id.* at 110. The D.C. Circuit affirmed the district court's dismissal of the lawsuit, but on a distinct ground: The D.C. Circuit held that, after performing an investigation, the Secretary had found that the employer *did not* violate § 660(c), and dismissal was therefore appropriate because the federal OSHA statute indicates that the Secretary "shall" bring suit only if he or she determines that the statute *was* violated. *Id.* at 111–12. The D.C. Circuit then went on expressly to reserve the questions whether "the Secretary's determination of a violation *vel non* or her determination upon finding a violation not to file a complaint are subject to review." *Id.* at 112 n.9.

The D.C. Circuit in *Wood* further noted that § 660(c)(2) "designates the Secretary as the official who decides whether and to what extent an investigation is 'appropriate' and, based on that investigation, whether the complainant has made out a claim that his employer discriminated against him, by discharge or otherwise, for his protected activity." *Id.* at 112. Given the mandatory language of the statute— that the Secretary "*shall* cause such investigation to be made as he deems appropriate" and "*shall* bring an action" if the statute is violated, *see* 29 U.S.C. § 660(c) (emphases added)—we understand the D.C. Circuit's observation as speaking to a general filtering function the Secretary performs with respect to facially insufficient complaints. In other words, the Secretary may determine that a complaint is facially insufficient and decline to order any further investigation into the employee's allegations, but the Secretary may not refuse to investigate a facially valid complaint.

Two other Circuit opinions support that interpretation of the federal statute.  In *Secretary, U.S. Department of Labor v. Lear Corp. Eeds & Interiors*, 822 F.3d 556 (11th Cir. 2016), the Secretary opened an investigation into the complainant's case and quickly determined that the employer *did* engage in retaliation.  *Id.* at 560.  The Eleventh Circuit stated that the federal OSHA statute "does not require that the Secretary complete his investigation before determining that a retaliation violation occurred; instead, the extent of the investigation is entirely discretionary.  The Secretary only has a duty to investigate a complaint to the extent he 'deems appropriate,' which leaves to the Secretary the decision of how much investigation to conduct upon receipt of a retaliation complaint."  *Id.*  This language indicates that although the Secretary has an obligation to perform *some kind of investigation* into a facially valid complaint, the Secretary has discretion over the scope or extent of the investigation.

Finally, in the course of explaining that Congress intended for suits brought by the Secretary of Labor to be the "exclusive means of redressing violations" of the statute, *Taylor v. Brighton Corp.*, 616 F.2d 256, 259 (6th Cir. 1980), the Sixth Circuit remarked that the legislative history of § 660(c) indicates that "the Senate wanted the Secretary to screen out frivolous complaints so as not to overburden the hearing body."  *Id.* at 261.  As the Sixth Circuit explained, a predecessor version of § 660(c) required a record hearing as part of the Secretary's investigation into every complaint. *Id.*  But the Senate later re-assigned that task to the Occupational Safety and Health Review Commission, thereby confining "record hearings to cases the Secretary found meritorious." *Id.* at 261–62.  Although the Senate and House conferees eventually further narrowed the role of the Review Commission so that the Secretary now prosecutes

§ 660(c) actions in the district courts rather than before the Review Commission, this legislative history—in addition to Congress's decision to clarify that the Secretary need only "cause such investigation to be made as he deems appropriate"—indicates that Congress wanted to ensure that the Secretary had the flexibility efficiently to dismiss frivolous complaints.

In sum, federal precedent tends to support the view that § 660(c) places a mandatory burden on the Secretary of Labor to perform at least *some* investigation into facially valid complaints. And because the language and substance of Nevada Revised Statutes § 618.445 are rooted in § 660(c), this precedent indicates that the same mandatory burden applies to the NOSHA Administrator as well.

Turning to Ninth Circuit case law, *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56 (9th Cir. 1994), although far afield on its facts, is quite informative as to the type of statutory language sufficient to give rise to a property interest in a beneficiary. *Wedges/Ledges* addressed a Phoenix City Code provision governing licenses for games of skill and considered whether it created a property interest in new licenses for qualified applicants. *Id.* at 59–60. The Code provided that the City Treasurer "shall make a determination as to whether or not [a proffered machine] qualifies as a game of skill based on an evaluation of the machine and recommendation by the police department and other relevant information" and that owners of approved machines "shall be issued" game license tags. *Id.* at 63 (alteration in original) (quoting Phoenix City Code § 7-28). The term "game of skill" was defined in the statute as "any game, contest, or amusement of any description in which the designating element of the outcome . . . is the judgment, skill, or adroitness of the participant in the contest and not

chance." *Id.* (alteration in original) (quoting Phoenix City Code § 7-3).

*Wedges/Ledges* reasoned that the "game of skill" criteria sufficiently constrained the City Treasurer's discretion with regard to evaluating whether a machine qualified as a game of skill, and issuing a license if it did, to establish a property right in licenses for qualifying games of skill. "The use of the imperative in [the] provisions is sufficient to create an expectation in applicants that, as long as their machines qualify as games of skill, they have a right to obtain license tags." *Id.* The broad statutory mandate to consider the "evaluation[s]" and "other relevant information" did not provide discretion sufficient to undercut the property interest, *Wedges/Ledges* held, as the Code "does not allow the City Treasurer to rest its decision on anything other than the 'game of skill' determination." *Id.*

The Nevada whistleblower statute similarly uses mandatory language. Like the ordinance at issue in *Wedges/Ledges*, it first requires the Administrator to make a determination: the "Administrator shall cause . . . investigation to be made" as to whether "the provisions of subsection 1" have been violated. Nev. Rev. Stat. § 618.445(3). The Administrator must base that determination on those provisions, which specify that an employer "shall not discharge or in any manner discriminate against any employee because the employee has filed any complaint or instituted or caused to be instituted any proceeding . . . , has testified or is about to testify in any such proceeding," has reported an instance of workplace violence, or has exercised "any right afforded by [the Occupational Safety and Health] chapter." *Id.* § 618.445(1). And just as the *Wedges/Ledges* code provision specified that a license must issue if the specific criteria were met, so under

§ 618.445, "the Administrator *shall* bring an action" if he determines that the substantive provisions were violated. *Id.* § 618.445(3) (emphasis added).

Section 618.445(3) does allow the Administrator to conduct "such investigation . . . as [he] deems appropriate." But, like the "other relevant information" the Treasurer was allowed to consider in *Wedges/Ledges*, the Administrator's ability to decide how to investigate does not provide discretion to base his decision whether to bring an action on anything other than a determination as to whether the statute was violated. *Wedges/Ledges*, 24 F.3d at 63. Likewise, in *Parks v. Watson*, 716 F.2d 646 (9th Cir. 1983) (per curiam), we determined that criteria including specific requirements for notice and consent along with a broad directive to consider "the public interest" nevertheless "define[d] an articulable standard" sufficient to give rise to a property interest in vacating city streets. *Id.* at 657.

In contrast, statutes that we have held do not establish property rights offer the decisionmaker discretionary or indeterminate grounds for action. *Allen v. City of Beverly Hills*, 911 F.2d 367 (9th Cir. 1990), for example, addressed a provision allowing layoffs "[w]henever in the judgment of the Council it becomes necessary in the interests of economy or because the necessity for a position no longer exists." *Id.* at 370. *Allen* held that this language was insufficiently specific to provide the "particularized standards or criteria" necessary to a protected property interest. *Id.* Similarly, *Jacobson v. Hannifin*, 627 F.2d 177 (9th Cir. 1980), held that a Nevada statute granting licensing authority "full and absolute power and authority" to deny license applications "for any cause deemed reasonable" did not establish a property interest in obtaining the license. *Id.* at 180 (quoting Nev. Rev. Stat. § 463.220(6)).

Nevada's whistleblower protection statute sets forth mandatory criteria the Administrator must assess to make his determination. In so doing, the statute gives complainants a "legitimate claim of entitlement" to an investigation of their complaint and to an action being brought on their behalf if the investigation shows a violation of the statutory provisions. That legitimate entitlement is sufficient to trigger procedural due process protection, although not to determine what process is due when the agency considers whether and how to investigate and whether to file suit.

A comparison to other agencies' enforcement statutes supports our conclusion. As mentioned, the Nevada statute is patterned on the federal OSHA enforcement statute, which similarly mandates that the Secretary "*shall* cause such investigation to be made as he deems appropriate" and "*shall* bring an action" if the statute is violated. 29 U.S.C. § 660(c) (emphases added). Such mandatory language is rare in similar enforcement provisions. Other statutory enforcement provisions use language *authorizing* the agency to bring claims but not mandating that it do so. For example, the enforcement provision of the National Labor Relations Act, 29 U.S.C. § 141 et seq., provides that the National Labor Relations Board "shall have power to issue and cause to be served" a complaint based on an unfair labor practice; there is no mandate for it to do so. *Id.* § 160(b).

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., includes a mix of mandatory and permissive language: The Commission "*shall* make an investigation" of any charge of an unfair employment practice and, if the Commission finds reasonable cause to support the charge, "*shall* endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e-5(b)

(emphases added). This investigation and conciliation is mandatory; if the Commission does not endeavor to use informal methods of enforcement, it may not bring a formal action. *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015). But if informal efforts fail, "the Commission *may* bring a civil action." *Id.* § 2000e-5(f)(1) (emphasis added).

In short, the NOSHA statute's mandatory language, key to our analysis given *Wedges/Ledges*, is determinative of the property interest question. The statute could have been written to make the enforcement action discretionary, as similar statutes do. But instead, bringing an action is required if, after an investigation (also mandatory), a violation is shown.

Defendants contend that, even if Armstrong has a property interest, she cannot show any lack of process because the whistleblower statute entitles Armstrong only to "such investigation . . . as the Administrator deems appropriate." Nev. Rev. Stat. § 618.445(3). We do not agree that the discretion provided to the Administrator as to the particulars of the investigation undermines the mandatory requirement—that there be *an* investigation, and that suit be filed if the requisite violations are found.

First, the text of the statute directs that *some* investigation be conducted. The statute mandates that "the Administrator shall cause such investigation to be made as the Administrator deems appropriate," *id.* § 618.445(3), not that the Administrator shall choose whether to investigate at all. In the context of Title VII, the Supreme Court has held that the statutory command that the Commissioner "shall endeavor" to use informal means of enforcement "provides the EEOC with wide latitude over the conciliation process" but does not mean "Congress has . . . left *everything* to the Commission." *Mach Mining*, 575 U.S. at 488. Specifically,

the EEOC cannot "decline[] to make *any* attempt to conciliate." *Id.* (emphasis added).  Similarly here, the wide latitude the statute provides the Administrator to determine the scope of investigation does not mean that he can entirely decline to investigate.

As a general matter, we do not construe statutes in ways that would raise serious doubts as to their constitutionality. *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (citing *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).  Were we to hold that "such investigation . . . as the Administrator deems appropriate" could include no investigation at all, the statute would not provide constitutional process for the deprivation of the protected property interest in filing suit if the statute was violated.  The Supreme Court has rejected the "bitter with the sweet" approach to due process, which would have allowed states to offer statutorily defined rights and simultaneously limit the procedures employed to determine or restrict those rights to something below constitutionally adequate process.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (citing *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974) (Powell, J., concurring in part and concurring in result in part)).  "While the legislature may elect not to confer a property interest . . . , it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Arnett*, 416 U.S. at 167 (Powell, J., concurring in part and concurring in result in part).  We decline to adopt Defendants' construction of § 618.445(3), which would— contrary to the text of the statute—always allow the Administrator to conduct *no* investigation before determining that a petitioner was not entitled to an action being brought on her behalf.

In other words, although some complaints may be facially meritless and therefore not warrant an investigation, the Administrator must undertake *some* investigation in cases involving facially meritorious complaints. And the requisites of pre-deprivation process should focus on safeguards ensuring that facially meritorious complaints are thoroughly investigated; one protection, for example, might be requiring NOSHA to explain any failure to investigate.

(4) Having determined that the Nevada statute provides a property interest in *some* investigation and in an action brought on behalf of an employee if the agency concludes that the complaint is merited, we finally turn to whether Armstrong has alleged that she was deprived of this interest without due process. "It is axiomatic that due process 'is flexible and calls for such procedural protections as the particular situation demands.'" *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). But we need not determine at this stage what level of procedural safeguards are constitutionally required for Nevada whistleblower complainants generally. Armstrong's complaint plausibly alleges that the process she received was essentially nonexistent and so constitutionally deficient.

First, Armstrong alleges that NOSHA never required ENTA to provide any documentation supporting her termination, and therefore never had any grounds on which to make the determination—required by Nevada law—as to whether the provisions of § 618.445(1) were violated. Second, Armstrong contends that she did not receive a decision from an impartial decisionmaker, as Pellegrini, whose actions alerted ENTA to Armstrong's whistleblowing and, Armstrong maintains, led to much of the retaliation she experienced, was involved throughout the process.

Pellegrini, Armstrong suggests, had reason to cover up the retaliation that ensued because of her mistake, and so to assist ENTA in denying a retaliatory motive. Armstrong also contends that NOSHA never provided her with notice of a settlement offer from ENTA, an action that undercut Armstrong's interest in *some* recovery while also undermining the government's interest in efficiency. Finally, Armstrong alleges NOSHA withheld documents pertinent to her case even after the case was closed. These contentions support an inference that Armstrong did not receive a fundamentally fair investigation before NOSHA closed her case.[3]

Defendants contest Armstrong's account of the procedural deficits Armstrong alleges—whether there was any factual investigation of ENTA's basis for discharge, whether there was an impartial decisionmaker, and whether Armstrong had an opportunity to respond to ENTA's position. But on a motion to dismiss we construe the complaint's allegations of material fact in the light most favorable to the nonmoving party. *Knievel*, 393 F.3d at 1072. So a dispute on the factual merits cannot affect our resolution of this motion to dismiss. If, upon further proceedings, Defendants establish that Armstrong was afforded more process than she alleges, the district court will need to determine in the first instance "what process the State provided, and whether it was constitutionally adequate." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990).

\* \* \* \*

---

[3] We express no view at this stage of the litigation as to whether fair post-deprivation procedures alone would be constitutionally sufficient without adequate pre-deprivation process.

In sum, the district court erred in holding that Armstrong did not have a property right in the investigation of her whistleblowing complaint. And Armstrong plausibly alleged in the FAC that NOSHA deprived her of procedural due process with regard to protecting that right.

## III.

The district court dismissed Armstrong's substantive due process claim with prejudice, on the basis that Armstrong's private employment meant that she was unable to "establish a protected property interest in her job for substantive due process purposes." We have determined that, with respect to her procedural due process claim, Armstrong demonstrated a protected property interest in an investigation and to some degree, in continued employment. But, albeit on a different basis, we agree with the district court's conclusion that Armstrong has not sufficiently alleged a substantive due process claim.

"[P]roperty interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, [but] substantive due process rights are created only by the Constitution." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring) (citing *Roth*, 408 U.S. at 577 (1972)). In cases involving employment, "[w]e have held that a plaintiff can make out a substantive due process claim if she is unable to pursue an occupation and this inability is caused by government actions that were arbitrary and lacking a rational basis." *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 997 (9th Cir. 2007), *aff'd on other grounds*, 553 U.S. 591 (2008). This substantive due process protection is based on a liberty interest in an occupation, *id.*, and "protects the right to pursue an entire profession, and not the right to pursue a particular job." *Id.* at 998.

*Engquist* addressed for the first time the question whether a substantive due process claim could succeed against a public employer for actions that precluded pursuing a particular occupation in the future. *Id*. In holding that such a claim could be valid, *Engquist* analogized to a larger body of case law concerning legislative action that restricted membership in certain professions. *See, e.g.*, *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999). But *Engquist* expressly limited substantive due process claims against public employers to "extreme cases, such as a 'government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license of an individual in an occupation that requires licensure.'" *Engquist*, 478 F.3d at 997–98 (quoting *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997)). *Engquist* reasoned that "[s]uch a governmental act would threaten the same right as a legislative action that effectively banned a person from a profession, and thus calls for the same level of constitutional protection." *Id.* at 998.

Neither situation hypothesized in *Engquist* is directly analogous to Armstrong's contention that government actors interfered with her ability to pursue private employment in her field. But two cases decided before *Engquist* indicate that government interference short of the *Engquist* hypotheticals can support a plausible substantive due process claim.

*Lebbos v. Judges of Superior Ct.*, 883 F.2d 810 (9th Cir. 1989), held that a plaintiff alleged a valid substantive due process claim where she contended that defendants "deprived her of the ability to practice law" by confiscating her mail and disrupting her financial transactions. *Id.* at 818.

And *Benigni v. City of Hemet*, 879 F.2d 473 (9th Cir. 1988), upheld a jury's verdict in the plaintiff's favor on a due process claim in which the plaintiff alleged that police officers harassed the customers of his restaurant and bar, intending to force him out of business. *Benigni* held that the evidence before the jury—which included testimony that the police engaged in five or six bar checks a night; followed, ticketed, and arrested customers; and parked across the street all evening—was sufficient to make out a substantive due process claim for governmental interference in pursuing a livelihood. *Id.* at 478.

Neither *Lebbos* nor *Benigni* articulated a general standard for the level of government interference in private employment needed to plausibly allege a substantive due process violation. But both cases align with the overall framework set forth in *Engquist*, limiting substantive due process claims to extreme cases involving conduct analogous to a prohibition on working in an entire profession or in running legitimate businesses. *Engquist*, 478 F.3d at 997–98. Without access to mail or the ability to conduct financial transactions, Lebbos plausibly alleged that she was unable to effectively practice law. *Lebbos*, 883 F.2d at 818. The excessive and unreasonable police actions endured by Benigni were deliberately designed to force him out of business. *Benigni*, 879 F.2d at 478. The challenged government actions in both cases involved extreme conduct that had the same practical effect as if the government had revoked Lebbos's license to practice law or Benigni's license to operate a bar.

In contrast, Armstrong has not plausibly alleged that she is unable to pursue an entire occupation due to Defendant's actions. Her complaint alleged that those actions caused "a loss of 13 years of future employment, . . . loss of a clean

employment file, and loss of a neutral recommendation to possible future employers." But the complaint did not allege any facts supporting the calculation of 13 years of lost future employment, or otherwise suggest that Defendants' actions entirely precluded Armstrong's ability to work as a human resources professional elsewhere.

The district court denied Armstrong leave to amend the substantive due process claim in her FAC, "because amendment would be futile." The district court did not abuse its discretion in doing so.

In her briefs in this appeal, Armstrong contends that her substantive due process claim is supported by her July 2019 declaration, in which she avers that Dr. Becker, the senior partner of ENTA, "contacted my physician and my pharmacy and attempted to black ball me throughout the industry making further employment in my chosen field impossible." She also cites her proposed second amended complaint, which included an allegation that Defendants' actions "also resulted in damage to [Armstrong's] standing in the community and the possible loss of all future employment in her chosen profession. [She] has not been able to work since the denial of her rights to an appropriate investigation by the Defendants of her claims against ENTA."[4] But neither document alleges facts showing that the Defendants participated in causing, intended to cause, or could reasonably foresee that their actions would cause a private employer to "attempt[] to black ball [Armstrong] throughout the industry." Nothing in the second amended

---

[4] The magistrate judge recommended that Armstrong's substantive due process claim in the proposed second amended complaint be denied on the basis that the claim had been dismissed with prejudice, a recommendation adopted by the district court.

complaint or Armstrong's later-filed affidavit includes allegations of *Defendants'* conduct rising to the level of a government blacklist or the revocation of a license to practice a particular profession.

Accordingly, we hold that the district court did not err in dismissing Armstrong's substantive Due Process claim and denying Armstrong leave to amend her complaint.

## IV.

On appeal, Armstrong is pursuing her NIED claim only against Pellegrini, for negligently copying ENTA on the letter acknowledging the withdrawal of Armstrong's claims and falsely claiming that she had been required to do so. Nevada law, an NIED claim by a direct victim has the same elements as an intentional infliction of emotional distress (IIED) claim, except that the plaintiff need only show that the acts causing distress were committed negligently.[5] *See Abrams v. Sanson*, 136 Nev. 83, 92 (2020). The elements of IIED are: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme

---

[5] Federal district courts in Nevada have often read *Shoen v. Amerco, Inc.*, 111 Nev. 735, 748 (1995), as differentiating between negligence claims with emotional damages—available to direct victims—and NIED claims—available only to bystanders. *E.g.*, *Ballentine v. Las Vegas Metro. Police Dep't*, No. 2:14-cv-01584-APG-GWF, 2016 WL 950920, at *4 (D. Nev. Mar. 7, 2016) (listing district court opinions so holding and describing one as "explaining the Nevada Supreme Court's holding in *Shoen*"). But *Abrams v. Sanson*, 136 Nev. 83 (2020), recently described *Shoen* as "allowing for negligent infliction of emotional distress if the acts arising under intentional infliction of emotional distress were committed negligently." *Id.* at 92. We are bound by decisions of the Nevada Supreme Court interpreting Nevada law. *See All. for Prop. Rts. & Fiscal Resp.*, 742 F.3d at 1102.

emotional distress and (3) actual or proximate causation." *Star v. Rabello*, 97 Nev. 124, 125 (1981). For NIED claims brought for negligent actions committed directly against a plaintiff, "either a physical impact must have occurred or . . . proof of serious emotional distress causing physical injury or illness must be presented." *Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 448 (1998) (internal quotation marks omitted).

The district court did not address the substance of Plaintiffs' NIED claim, instead holding that Defendants were immune from Armstrong's state law negligence claims, including NIED, under Nevada's discretionary function immunity statute. Nev. Rev. Stat. § 41.032(2). In this appeal, Defendants similarly contend only that Armstrong's NIED claim is barred by discretionary function immunity. It is not.

Nevada has generally waived its state sovereign immunity. Nev. Rev. Stat. § 41.031(1). But Nevada retains immunity for officers or employees of the state for actions "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused." *Id.* § 41.032(2). In determining whether an act is protected by the discretionary function statute, Nevada has adopted the *Berkovitz-Gaubert* test, articulated by the Supreme Court in the context of analyzing the Federal Tort Claims Act's discretionary function exception. *Martinez v. Maruszczak*, 123 Nev. 433, 446 (2007); *see Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). The *Berkovitz-Gaubert* test involves a two-step analysis: "to fall within the scope of discretionary-act immunity, a decision must (1) involve an element of individual judgment or choice and (2) be based

on considerations of social, economic, or political policy." *Martinez*, 123 Nev. 433, at 446–47. *Gaubert* further explained that "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are *susceptible* to policy analysis." 499 U.S. at 325. "Decisions at all levels of government, including frequent or routine decisions, may be protected by discretionary-act immunity, if the decisions require analysis of government policy concerns." *Martinez*, 123 Nev. at 447.

We have emphasized that "before turning to *Berkovitz*'s two-step inquiry, we must first identify Plaintiffs' 'specific allegations of agency wrongdoing.'" *Young v. United States*, 769 F.3d 1047, 1053 (9th Cir. 2014) (citing *Berkovitz*, 486 U.S. at 540). "[T]he precise action the government took or failed to take (that is, how it is alleged to have been negligent) is a necessary predicate to determining whether the government had discretion to take that action." *Id.* at 1054.

Here, the district court broadly analyzed the discretionary nature of Defendants' "choices in how to pursue and close [the] investigation." But Armstrong's NIED claim against Pellegrini is premised not on the overall manner in which the investigation was pursued and closed, but on one specific aspect of Pelligrini's actions: the FAC alleges that Pellegrini "negligently made ENTA aware that Armstrong had filed a whistleblower complaint," "despite investigator's Ybarra's log entry of June 16, 2014," which specified that Armstrong's decision to withdraw was to protect herself from retaliation because "her employer had not been notified of the complaint." (Capitalization simplified.) Armstrong alleges that Pellegrini's actions contributed to her becoming "physically ill and mentally

destroyed," and that the emotional distress of the subsequent retaliation resulted in Armstrong's hospitalization and surgery the day she returned to work.

On the first prong of the *Berkovitz-Gaubert* test, we conclude that Pellegrini's specific decision to copy ENTA on the letter she sent to Armstrong did "involve an element of individual judgment or choice." *Martinez*, 123 Nev. at 446–47. The 2011 OSHA manual, which was in effect at the time,[6] gives little discretion to investigators when a complainant withdraws her complaint. "In cases where the withdrawal request is made orally, the investigator *must* send the complainant a letter" describing the rights being waived, and upon supervisor approval "a second letter *must* be sent to the complainant." (Emphases added.) Although other sections mandate letters be sent "to the complainant, with a copy to the respondent," the withdrawal section makes no mention of the employer. But the withdrawal section directs investigators to "sample letters at the end of this chapter." The Sample Withdrawal Approval Letter copies the Respondent in a cc: line, while explaining that "[a] letter of this type must be sent to the complainant"—again, despite the cc: line, not mentioning the respondent.

A "sample" letter does not dictate the content or form of the letter or mandate that its structure be followed when it does not match the circumstances. The rest of the OSHA manual, which does read as mandatory, directs sending the withdrawal letter to the complainant, with no mention of the

---

[6] This OSHA manual is referred to in the complaint, is central to determining discretionary function immunity, and is cited by both parties without questioning the authenticity of the attached document. We therefore look to the manual as a document on which the complaint necessarily relies. *See Marder*, 450 F.3d at 448.

respondent. At best—and we shall so assume, without deciding—the combination of the manual's text and the inclusion of the sample letter allows for the exercise of judgment on whether to include the cc: line or not, depending on whether doing so fits the circumstances.

Turning to the second prong of the *Berkovitz-Gaubert* test, however, the specific discretionary action of copying ENTA on the withdrawal letter was not susceptible to "considerations of social, economic, or political policy." *Martinez*, 123 Nev. at 446. "[C]ertain acts, although discretionary, do not fall within the ambit of discretionary-act immunity because they involve negligence unrelated to any plausible policy objectives." *Butler ex rel. Biller v. Bayer*, 123 Nev. 450, 466 (2007) (internal quotation marks omitted). Although "the discretionary function exception protects agency decisions concerning the scope and manner in which it *conducts* an investigation so long as the agency does not violate a mandatory directive," *Vickers v. United States*, 228 F.3d 944, 951 (9th Cir. 2000) (emphasis added), that protection is based on the political and social judgments that investigators must make as they investigate whether legal violations have occurred. *Cf. Sabow v. United States*, 93 F.3d 1445, 1454 (9th Cir. 1996). The narrow decision to copy ENTA on a letter acknowledging the withdrawal of Armstrong's complaint, by contrast, was made after her first complaint was closed and before her last complaint was filed or any investigation was conducted, and did not involve such considerations.

Outside the investigation context, *Butler ex rel. Biller v. Bayer* explicates the limits of the second prong of the *Berkovitz-Gaubert* discretionary function analysis under Nevada law. 123 Nev. at 466. *Butler* concerned the actions of prison officials who left a quadriplegic parolee at an

unsuitable residence. *Id.* at 455–57. The Nevada Supreme Court held that those actions were discretionary for the purpose of Butler's state law negligence claims, but not subject to considerations of policy and so outside the discretionary function exception. *Id.* at 466–67. *Butler* explained that "several decisions, including the decision to parole Butler and the formulation of any overarching prison policies for inmate release are policy decisions that require analysis of multiple social, economic, efficiency, and planning concerns," but "physically releasing Butler, including the decision to leave Butler at Woods' residence despite the obvious lack of preparation" did not involve political or economic considerations, and so was not within discretionary function immunity. *Id.* at 466–67. Similarly, the formulation of policies in the NOSHA manual was subject to social, political, and economic analysis, and the manner of carrying out an investigation could be as well, but we see no basis for concluding—and Pellegrini has provided none—that the allegedly negligent decision to copy ENTA when sending the withdrawal letter involved such policy considerations.

Pellegrini argues that "[t]he policy behind sending the withdrawal letter is to let the whistleblower know, in writing, that they still have rights although they have withdrawn the claim," and that the letter "lets [the whistleblower's] employer know that if they retaliate against the employe[e] based on her whistleblowing activities, [NOSHA] is there to advise her." But the content of the letter is not the decision at issue here. Even if it was, the content, although not the exact language and form of the letter, is mandated by the Manual. And although it might be a beneficial policy to let employers know that employees are protected from retaliation, the letter informed ENTA of whistleblowing activity—filing the complaint—of which it was previously

unaware, without saying anything to warn against retaliation based on that activity. If anything, copying the letter to ENTA was likely to lead to more retaliation, not less—exactly what Armstrong alleges.

In short, Pellegrini has offered no cognizable social, political, or economic reason for the specific act of copying ENTA on the template letter to Armstrong. The district court therefore erred in concluding that Armstrong's NIED claim was subject to discretionary function immunity. As Pellegrini has not argued that the dismissal can be affirmed on any other ground, we do not consider the adequacy otherwise of the NIED allegation in the complaint but simply reverse the dismissal of Armstrong's NIED claim.

## V.

Finally, Armstrong argues that the district court erred in dismissing her claim for civil conspiracy. "In Nevada, an actionable civil conspiracy is defined as 'a combination of two or more persons, who by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage.'" *Flowers v. Carville*, 266 F. Supp. 2d 1245, 1249 (D. Nev. 2003) (quoting *Collins v. Union Fed. Sav. & Loan Ass'n*, 99 Nev. 284, 303 (1983)).[7] The FAC alleges that "Defendants conspired and agreed among themselves in their individual capacities and as persons in authority in the public agencies"

---

[7] The Nevada Supreme Court does not appear to have squarely addressed whether a civil conspiracy claim must be predicated on an underlying state tort. *Cf. Sprewell v. Golden State Warriors*, 266 F.3d 979, 992 (9th Cir. 2001) (discussing the requirements of civil conspiracy in California law). As both parties assume that a constitutional violation can be the unlawful objective in a civil conspiracy claim, we likewise assume without deciding that such a claim is valid under Nevada law.

to "deny due process to the Plaintiff, and to commit other wrongs as outlined above and below."

The district court dismissed Armstrong's civil conspiracy claim on the basis that it was barred by the intracorporate conspiracy doctrine. Under that doctrine, "[a]gents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage." *Collins*, 99 Nev. at 303. In *Collins*, the Nevada Supreme Court applied the intracorporate conspiracy doctrine to civil conspiracy, citing similar application of the doctrine to state civil conspiracy actions in Oregon and California.[8] *Id.*

Armstrong concedes that Defendants are part of the same agency, as Nevada's OSHA office is within the Division of Industrial Relations, which is within the Department of Business and Industry. Nev. Rev. Stat. § 618.235. But Armstrong contends that she adequately pleaded a conspiracy between Defendants and ENTA, so that the intracorporate conspiracy doctrine is inapplicable. We disagree. The FAC focused on a conspiracy among the Defendants. It does not allege sufficient facts to support a conspiracy involving ENTA.

---

[8] Armstrong does not challenge the district court's conclusion that the intracorporate conspiracy doctrine would apply to government employees sued in their individual capacities. We therefore assume without deciding that Nevada would apply the doctrine to government defendants. We note that in the context of federal conspiracy claims, this court has expressly reserved the question "whether individual members of a single government entity can form a 'conspiracy' within the meaning of section 1985." *Portman*, 995 F.2d at 910.

"When pleading a claim for civil conspiracy, a plaintiff must plead with particular specificity as to 'the manner in which a defendant joined in the conspiracy and how he participated in it.'" *Century Sur. Co. v. Prince*, 265 F. Supp. 3d 1182, 1194 (D. Nev. 2017), *aff'd*, 782 F. App'x 553 (9th Cir. 2019) (quoting *Arroyo v. Wheat*, 591 F. Supp. 141, 144 (D. Nev. 1984)).  The FAC alleged only that ENTA "did everything it could to block, deny, delay, and buy all the time needed to run out the clock" and "this delay was allowed, encouraged, aided, and abetted by the Defendants."  The FAC also alleged that NOSHA kept ENTA in the loop on the progress of the investigation while stonewalling Armstrong and her representative.

These contentions, even if assumed true, do not include any allegations as to whether and when ENTA and NOSHA joined in a specific agreement to deny Armstrong her procedural due process rights.  Allowing, encouraging, aiding, and abetting—which is what NOSHA is alleged to have done—is insufficient to support a plausible allegation that ENTA and Defendants engaged in a concerted action with an intent to accomplish an agreed-upon unlawful objective.  *See Flowers*, 266 F. Supp. 2d at 1249.

The district court therefore did not err in dismissing Armstrong's civil conspiracy claim as barred by the intracorporate conspiracy doctrine.  But we cannot agree with the district court's denial of leave to amend the complaint as to the conspiracy claim.  Again, "[a]s a general rule, '[d]ismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.'"  *Sonoma Cnty. Ass'n of Retired Emps.*, 708 F.3d at 1118 (second alteration in original) (quoting *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991)).  Armstrong's briefs to the

district court, although not her complaint, include contentions that ENTA "was also part of the conspiracy," and that Defendants joined together "with ENTA" to block NOSHA's investigation.  And the extra-complaint materials offered by Armstrong include a declaration by Rick Lucas stating his "belie[f]" that Armstrong's firing was based on "direct coordination" between the Defendants and ENTA.  These bare allegations may not be sufficient to support a civil conspiracy claim, but it is not clear Armstrong would be unable to amend her complaint plausibly to allege facts underlying those conclusions.  If she can allege "direct coordination" between ENTA and the Defendants for an unlawful objective to harm her, it would be possible for her state a claim for civil conspiracy, requiring leave to amend. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1108 (9th Cir. 2003).

Accordingly, we hold that the district court's dismissal of Armstrong's civil conspiracy claim was proper, but the district court abused its discretion in dismissing without leave to amend her complaint.

The judgment of the district court is **REVERSED IN PART** and **AFFIRMED IN PART**.  We **REMAND** for further proceedings consistent with this opinion.  Costs on appeal are award to Armstrong.