**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHELSEY DUDLEY,

        *Plaintiff - Appellant*,

  v.

BOISE STATE UNIVERSITY;
TONY ROARK, in his official and
individual capacity; MANDY
NELSON, in her official and
individual capacity; KATE LAW, in
her official and individual capacity;
JOELLE POWERS, in her official
and individual capacity; JOHN
BUCKWALTER, in his official and
individual capacity; CHRISTOPHER
HYER, in his official and individual
capacity; ROGER MUNGER, in his
official and individual capacity;
GUNNAR WHISLER, in his official
and individual capacity; KELSIE
ZAK, in her official and individual
capacity; EMMA FORD, in her
official and individual capacity;
MIKE DIXON, in his official and
individual capacity,

        *Defendants - Appellees*.

No. 24-3233

D.C. No.
1:22-cv-00495-
DCN

OPINION

Appeal from the United States District Court
for the District of Idaho
David C. Nye, District Judge, Presiding

Argued and Submitted April 4, 2025
Portland, Oregon

Filed August 27, 2025

Before: Jay S. Bybee and Danielle J. Forrest, Circuit
Judges, and Xavier Rodriguez, District Judge.[*]

Opinion by Judge Bybee

## SUMMARY[**]

### Due Process

The panel affirmed in part and reversed in part the district court's judgment dismissing for failure to state a claim Chelsey Dudley's lawsuit alleging violations of her Fourteenth Amendment procedural and substantive due process rights arising from Boise State University's revocation of her bachelor's degree after the Idaho Department of Health and Welfare informed the university

---

[*] The Honorable Xavier Rodriguez, United States District Judge for the Western District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that Dudley used a state database to view a third party's confidential information without permission.

Addressing Dudley's procedural due process claim, the panel held that Dudley has a property interest in her degree that is protected by the Fourteenth Amendment and may not be rescinded without due process. The panel reversed the district court's dismissal of Dudley's procedural due process claim insofar as she alleged that defendants denied her sufficient time to present her defense and did not allow her to cross-examine university-affiliated witnesses at her conduct hearing, and remanded for further proceedings.

The panel affirmed the district court's dismissal of Dudley's substantive due process claim. First, the university's decision to revoke Dudley's degree and report that revocation, while procedurally infirm, was not substantively arbitrary and lacking a rational basis. Second, Dudley failed to allege that she is unable to pursue a career in the broader social work profession without a license or degree, or that she cannot pursue a social work education elsewhere.

The panel affirmed the district court's judgment granting qualified immunity to defendants as to Dudley's claims for monetary relief because it was not clearly established that Dudley had a property interest in her college degree or any entitlement to certain procedural protections.

Finally, the panel dismissed, as moot, Dudley's appeal of the district court's denial of an extension of a temporary restraining order issued in 2022.

**COUNSEL**

Jeremiah Hudson (argued), Fisher & Hudson PLLC, Boise, Idaho, for Plaintiff-Appellant.

Michael E. Kelly (argued) and Shannon M. Graham, Kelly Law PLLC, Boise, Idaho, for Defendants-Appellees.

**OPINION**

BYBEE, Circuit Judge:

Boise State University revoked Chelsey "Brooke" Dudley's bachelor's degree in social work after the Idaho Department of Health and Welfare (IDHW), which hosted Dudley for an internship, informed the university that Dudley used a state database to view a third party's confidential information without permission. Dudley sued the university, several students, several administrators and employees, and an IDHW employee (hereinafter, "BSU"), for violating her Fourteenth Amendment procedural and substantive due process rights. Dudley sought preliminary and permanent injunctive relief and money damages.

The district court dismissed Dudley's suit for failure to state a claim. As to Dudley's procedural due process claim, the district court concluded that she lacked a property interest in her degree, and that—even if she possessed such an interest—BSU gave her adequate process. With respect to Dudley's substantive due process claim, the district court concluded that Dudley failed to plausibly allege that she was unable to pursue a career in social work.

We reverse in part and affirm in part.  We hold that Dudley's BSU-issued college degree is a property interest protected by the Fourteenth Amendment and that BSU failed to afford Dudley adequate process before depriving her of that interest. However, because it was not clearly established that Dudley had a property interest in her college degree or any entitlement to certain procedural protections, we hold that Defendants are entitled to qualified immunity. Therefore, we affirm the district court's dismissal of Dudley's substantive due process claim seeking monetary damages. Finally, we dismiss Dudley's appeal of the district court's denial of a preliminary injunction.

## I. FACTS AND PROCEDURAL HISTORY

Dudley appeals the district court's dismissal of her suit under Fed. R. Civ. P. 12(b)(6).  Ordinarily, we would take the facts from Dudley's complaint, accept them as true, construe them in the light most favorable to her, and stop there.  *See GP Vincent II v. Estate of Beard*, 68 F.4th 508, 514 (9th Cir. 2023).  In this case, however, Dudley requested a temporary restraining order when she filed her complaint, and the parties submitted additional evidence to the district court in support of or opposition to that temporary restraining order. Where helpful, we have drawn some facts below from that record.  *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (describing how we may treat certain documents "as part of the complaint, and thus may assume that [their] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)").

A. *The Facts*

Dudley graduated from BSU in May 2022 with a bachelor's degree in social work.  As part of her required coursework, she completed an internship between January

and April 2022 with the Idaho Department of Health and Welfare (IDHW). BSU referred to the internship as "Social Work Field Practicum II" and coded it as SOCWRK 481 on her transcript. Dudley graduated from BSU in May 2022, and, in July 2022, she passed the Social Work Licensing Exam administered by the State Board of Social Work Examiners in the Idaho Department of Occupational Learning. In late August 2022, she was licensed as a social worker in the State of Idaho.

On November 2, 2022, Defendant Tony Roark, BSU's Interim Dean for the College of Health Sciences and Social Work, sent Dudley a letter notifying her that BSU had received information from IDHW "establishing beyond doubt that [she] accessed confidential client information within IDHW's database, information in files [she] had no authorization to view and in which [she] had no legitimate business interest." Specifically, Dudley is alleged to have accessed the records of the father of her child and the records of the biological mother of his other child. Roark also advised Dudley that BSU would retroactively change her passing grade for SOCWRK 481 to a failing grade. And because Dudley failed SOCWRK 481, she did not meet the requirements for graduation, rendering her transcript "invalid." Roark told her that she could appeal the decision to change her grade. He also told her that the matter had been referred to the Office of the Dean of Students for additional discipline. The next day, Mandy Nelson, BSU's Registrar, sent Dudley a letter stating her "degree has been rescinded." Nelson informed Dudley that her diploma was "no longer valid and should be destroyed."

Kate Law, BSU's Assistant Dean of Students, sent Dudley a letter on November 10, with the subject line "Notification of Formal Conduct Hearing." Law stated that

"it has been alleged that you have violated the Student Code of Conduct during Spring 2022" and cited "Section 4/AC[,] Violation of University Policy and/or Law."  Law recited that Dudley's alleged accessing of confidential files had been "documented by IDHW's IT department" and that the breach violated "the School of Social Work's field requirements, the [National Association of Social Workers] Code of Ethics, the Student Professional Conduct and Professional Standards, and IDHW's expectations for employees and interns . . . ."  Law indicated that Dudley would be subject to disciplinary procedures outlined in University Policy #2020, Student Code of Conduct Section 6.2.c, and she offered to meet with Dudley "to discuss the Student Code of Conduct process and [Dudley's] rights and responsibilities" under the policy.  Law scheduled a "conduct hearing" for December 12  to "review the[] charges."

On December 7, Dudley sued BSU, several BSU administrators and employees; the members of the Student Conduct Board; Mike Dixon, IDHW's chief of the Child Welfare Office; and ten unnamed employees of BSU or IDHW in the District of Idaho.  Dudley sought injunctive relief, monetary damages, and a temporary restraining order (TRO) to prevent BSU from holding her conduct hearing on December 12.  She also asked the court to order BSU to reinstate her degree.

The district court granted Dudley's TRO request, in part and *ex parte*, on December 9.  The district court enjoined the BSU Defendants from holding the conduct hearing, but it declined to require them to implement any specific procedural safeguards or reinstate Dudley's degree.  BSU accordingly "vacated" the scheduled conduct hearing.  When the district court declined to extend the TRO, which expired

on December 23, 2022, Law sent Dudley a letter that reset her conduct hearing for February 17, 2023.

BSU held Dudley's conduct hearing before a five-member Student Board of Conduct. There were no live witnesses. BSU was represented by an employee from the Dean of Students' Office (DSO), who was denominated the "Complainant," and who presented written statements from Dixon, Law, and Raymond Mullenax, BSU's Director of Field Education, that described Dudley's alleged misconduct. Dudley testified on her own behalf. She admitted that, while at IDHW, "she had likely clicked on hyperlinks of caregivers in her own" file within the IDHW database. Dudley claimed that she accessed her file because she was "in a unique position to . . . see how a common type of interaction was reported by a social worker with the perspective of the person who was interacting with the social worker." Dudley also testified that her IDHW supervisor referenced database records related to the supervisor's family members and instructed her to look at closed files to learn how to draft reports. Dudley complained of the time constraints placed upon her at the hearing and the fact that she was not permitted to cross-examine any witness who provided a written statement.

At the conclusion of the hearing, the Complainant asked the Board to revoke Dudley's degree and expel her from BSU. Dudley alleges that Law remained with the Board while they deliberated.

Law subsequently notified Dudley that the Student Board of Conduct decided to revoke her degree and expel her because it determined that it was "more likely than not" that she violated the ethical and professional standards and expectations established in BSU's Professional Conduct and

Professional Standards, IDHW's expectations for employees and interns, and "state/federal privacy laws." Law stated that the "start date" for both sanctions was March 15, 2023. Dudley unsuccessfully appealed the Board's decision.

## B. *Procedural History*

As we noted above, Dudley filed her suit in federal court in December 2022 in an effort to prevent BSU from conducting a hearing. The district court issued a TRO forbidding BSU from proceeding with a hearing, and BSU vacated the hearing in response. After holding a hearing, the district court declined to extend the TRO, which lapsed on December 23. BSU proceeded with the February 2023 hearing and issued its decision as we described above. In July 2023, Dudley filed an amended complaint in district court, alleging that Defendants violated the Due Process Clause of the Fourteenth Amendment and seeking monetary and injunctive relief. BSU moved to dismiss the complaint.

The district court dismissed Dudley's complaint. *See Dudley v. Boise State Univ.*, 732 F. Supp. 3d 1270 (D. Idaho 2024). The district court ruled that Dudley had no property interest in her SOCWRK 481 grade, her degree in social work, her BSU diploma, or the process by which BSU deprived her of those interests. *Id.* at 1279–83. The court observed that "[t]his holding effectively ends this case. Because there is no property interest at stake, there can be no due process violation." *Id.* at 1283. In the interest of judicial efficiency, and alternatively, the district court held that the Student Conduct Hearing afforded Dudley due process. *Id.* at 1285–87. The court further held that Dudley did not state a claim that Defendants deprived her of her substantive due process liberty interest in pursuing her chosen profession, social work. *Id.* at 1284. Finally, the court held that even if

Dudley had stated a cause of action under the Fourteenth Amendment, Defendants would be entitled to qualified immunity for any damages in their individual capacities. *Id.* at 1287–89. This appeal followed.

## II. STANDARD OF REVIEW

We review the district court's dismissal of Dudley's suit under Fed. R. Civ. P. 12(b)(6) *de novo*. *Barker v. Riverside Cnty. Off. of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009). We accept Dudley's allegations as true and draw inferences from them in the light most favorable to her. *Id.*

Although "[g]enerally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint," we "may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (citations omitted). Here, because Dudley's First Amended Complaint refers to documents which she attached to her motion for a preliminary injunction, those documents are "central" to her case, and neither party disputes those documents' authenticity, we review those documents alongside Dudley's First Amended Complaint. *See id.*

## III. DISCUSSION

Dudley has presented four issues on appeal. First, Dudley claims that she has property interests in various facets of her BSU education and that BSU's recission of those interests, first without process or notice, and then after a "conduct hearing," violated the Due Process Clause of the Fourteenth Amendment. Second, she claims that BSU

violated her Fourteenth Amendment substantive due process right to pursue an occupation in social work. Third, she argues that the district court erred when it held that, even if BSU violated her due process rights, the individual defendants were entitled to qualified immunity from her request for monetary damages because her rights were not clearly established. Fourth, she argues that the court erred when it denied her preliminary injunctive relief. We discuss each of these issues below.

## A. *Procedural Due Process*

We first consider whether Dudley plausibly alleged that Defendants violated her Fourteenth Amendment procedural due process rights. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "To obtain relief on a procedural due process claim, the plaintiff must establish the existence of '(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process.'" *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008) (alteration in original) (quoting *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993)). Because BSU does not dispute that it has taken various actions against Dudley that would constitute a deprivation if she had a property right, we must consider whether Dudley had any property interests in various aspects of her BSU education, and if so, whether BSU provided her with sufficient notice and process before depriving her of those interests. The district court held for BSU on both questions. *Dudley*, 732 F. Supp. 3d at 1279–83, 1285–87. We reverse on both.

1.  Dudley's property interests in her BSU education

"When [the Fourteenth Amendment's protection of life, liberty, or property is] implicated, the right to some kind of prior hearing is paramount." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569–70 (1972) (footnote omitted). Although the Due Process Clause imposes "process" requirements, it does not supply the meaning of "property." Property interests are instead "defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577.

After the Supreme Court's groundbreaking decisions in *Roth* and *Perry v. Sindermann*, 408 U.S. 593 (1972), the term "property" in the Due Process Clause can no longer be "limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests." *Perry*, 408 U.S. at 601 (citing *Roth*, 408 U.S. at 577). As we have explained, "[d]ue process protects property interests 'well beyond actual ownership of real estate, chattels, or money.'" *Redd v. Guerrero*, 84 F.4th 874, 893 (9th Cir. 2023) (quoting *Roth*, 408 U.S. at 571–72). Following *Roth*, *Sindermann*, and the Court's recognition of the "new property," courts have identified property interests in "utility service, public education, welfare benefits, driver's licenses, nursing care, a cause of action, and a type of immigration petition." *Redd*, 84 F.4th at 893 (citations omitted); *see Goldberg v. Kelley*, 397 U.S. 254, 262 n.8 (1970) (holding that welfare benefits are a form of property as "a matter of statutory entitlement for persons qualified to receive them" and citing, *inter alia*, Charles Alan Reich, *The New Property*, 73 Yale L.J. 733 (1964)); *see also Johnson v. Ryan*, 55 F.4th 1167, 1191–92 (9th Cir. 2022) (describing the "'new property' revolution"

that "began with *Goldberg*" and was "developed" in *Roth* and *Sindermann*).

"To have a property interest in a benefit, a person must 'have a legitimate claim of entitlement to it,' not just 'an abstract need or desire for it.'" *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 972 (9th Cir. 2015) (quoting *Roth*, 408 U.S. at 577). We look to "the language of the statute and the extent to which the entitlement is couched in mandatory terms" to determine whether state law gives rise to a protected property interest. *Redd*, 84 F.4th at 893 (citing *Greene v. Babbitt*, 64 F.3d 1266, 1272 (9th Cir. 1995)).

Dudley asserts that the Due Process Clause protects four discrete property interests: her SOCWRK 481 grade, BSU's disciplinary process, her bachelor's degree awarded in May 2022, and her future reenrollment at BSU.

We can set two of these interests aside quickly. First, we need not decide whether Dudley has a property interest in her SOCWRK 481 grade because we think that, in this case, that question is subsumed by her claim to a property right in her degree, which we discuss in greater detail below. Second, BSU's disciplinary process cannot be Dudley's property for due process purposes.[1] Concluding otherwise would place the cart before the horse: "[T]he mere fact . . . [of] a careful procedural structure . . . [does not] indicate[] the existence of a protected liberty interest." *Hewitt v. Helms*, 459 U.S. 460, 471 (1983); *see also Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a

---

[1] Dudley relies on ISBOE Policy III.B.2.iii.3, which provides: "In matters of disciplinary action, students have the right to due process and to be held accountable using academic standards and institutional procedures."

substantive interest to which the individual has a legitimate claim of entitlement."). A state may provide process to address its interests without imbuing those affected by the process with substantive rights in the process itself. In such cases, it may be "unfair for the [state] not to follow its own procedures . . . but it [is] not unconstitutional." *Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 774 (7th Cir. 2013).

That leaves Dudley with two potentially viable property interests: (a) her BSU degree and (b) her future reenrollment at BSU. We consider whether Dudley has "a legitimate claim of entitlement" to each one. *Roth*, 408 U.S. at 577.

### a. Dudley's bachelor's degree

Although Dudley contends that certain regulations governing the conferral of her degree provide her with a contract-based property interest in her diploma, we need not reach this argument.[2] Dudley has not sued BSU for failing to confer a degree that she earned; nor has BSU refused to confer anything. Dudley instead challenges BSU's *revocation* of a degree that it *already* conferred to her.

Regardless of whether BSU and Dudley had an enforceable contract for a degree, she had "a legitimate claim of entitlement to it" under Idaho law. *See id.* Idaho's law *does* provide Dudley with a property interest in her degree. The Idaho Constitution and Idaho statutes authorize the Idaho State Board of Education (ISBOE) to promulgate educational regulations. *See* Idaho Const. art. IX, § 2

---

[2] *See*, *e.g.*, The Idaho Supreme Court has stated that "it is by now well-settled that the principal relationship between a college and its students is contractual." *Wickstrom v. N. Idaho Coll.*, 725 P.2d 155, 157 (Idaho 1986).

(vesting the ISBOE with certain powers); Idaho Code § 33-2811 (granting the ISBOE the authority to "confer such degrees and grant such diplomas as are usual in universities, or as they shall deem appropriate"). And the ISBOE promulgated a regulation that gives college graduates like Dudley a property interest in their degrees. *See* ISBOE Governing Policies and Procedures § III.E.1 (stating that "[c]ompletion of the program of instruction results in . . . conferring of a degree upon the student by the faculty and the Chief Executive Officer"). Because ISBOE policy § III.E.1. is couched in "mandatory language" that "leaves no discretion" for BSU to deny conferral of a degree upon "completion of the program of instruction," Idaho law created a property interest in Dudley's degree. *See Redd*, 84 F.4th at 893.

Moreover, it is not difficult to see how, for a recipient, a college degree "resembles more traditional conceptions of property," because it has an "ascertainable monetary value," one that can be measured in tuition payments. *See Redd*, 84 F.4th at 893–94 (citation omitted); *see also, e.g., Crook v. Baker*, 813 F.2d 88, 94 (6th Cir. 1987) (assuming that a university "degree constituted an important property interest"). But a college degree opens additional opportunities to its recipient that cannot be reduced to the bursar's account. College and university degrees are frequently prerequisites for employment opportunities and admission to graduate school, professional programs, or, as relevant here, professional licensing. *See Goss v. Lopez*, 419 U.S. 565, 575 & n.7 (1975) (observing that school discipline may "interfere with later opportunities for higher education and employment"); *see also Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 82 n.1 (1978) (noting that a medical student's dismissal would make it difficult for her to

get into another medical school).  To obtain a social work license in Idaho, an applicant must pass an examination and have, at least, "a baccalaureate degree in social work from a college or university approved by the board."  Idaho Code § 54-3206(3).  Here, Dudley alleges that, three months after graduating from BSU, she passed the Social Work Licensing Exam and was licensed as a social worker in the State of Idaho.[3]

BSU conferred a diploma to Dudley in a public ceremony.  The diploma itself is physical property, suitable for framing.  And BSU has effectively demanded it back.  The diploma was important enough that, when BSU first decided that Dudley had violated various terms of her internship, university rules, and national ethical rules for social workers, it advised her that "the diploma you received for your BA is no longer valid *and should be destroyed*."  While Dudley's diploma, like the title to a car, has relatively little intrinsic value, it has substantial extrinsic value as near-conclusive evidence of a bundle of legal rights.  The diploma's real value is not in its sheepskin, but in what it represents: the rights and responsibilities pertaining to a Bachelor of Arts degree from BSU.

In sum, Dudley's diploma, and the degree it represents, have real value.  Therefore, we hold that Dudley's degree is a property interest that BSU may not rescind without due process.

---

[3] In November 2022, the Board of Social Work Examiners within the Idaho Division of Occupational and Professional Licenses sent Dudley a letter requesting further information regard BSU's retraction of her degree.  The Board's inquiry is on hold pending resolution of this case.

### b. Re-enrollment

Dudley also maintains that she has a property interest in her future enrollment at BSU. Having concluded that she has a property interest in her degree, it is both premature and unnecessary for us to consider her interest in re-enrollment. As we will discuss, if the allegations in Dudley's complaint are true, BSU must hold a new hearing that affords Dudley greater process. If, at the end of those proceedings, BSU decides not to revoke Dudley's degree, re-enrollment will not be an issue. If it instead revokes her degree after a constitutionally-adequate hearing, even assuming Dudley has a property interest in re-enrollment, BSU will have afforded her a constitutionally-adequate hearing before depriving her of that interest. The accusations underlying Dudley's degree revocation and her expulsion are the same, and there is no reason to believe that a hearing that suffices as to the former would be unconstitutional as to the latter. Indeed, BSU reached its revocation and expulsion decisions following the same hearing, and Dudley does not argue that more process is necessary for one decision versus another. Thus, we need not decide whether Dudley has a property interest in re-enrollment.

### 2. The process due

Having decided that Dudley has a property interest in her BSU degree, we next consider whether BSU provided her with sufficient procedural safeguards when it revoked that degree. Dudley claims that BSU violated her due process rights by depriving her of her degree twice: first without any notice or hearing in November 2022, and then again, in March 2023, after a "conduct hearing." To determine what process is due before BSU may deprive Dudley of her degree, we balance three factors: (a) Dudley's interest in

retaining her degree; (b) BSU's interest in revoking her degree; and (c) the risk that, given the process provided, BSU erroneously deprived Dudley of her interest and the probable value and burdens of additional safeguards. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

### a. Dudley's interest in retaining her degree

For reasons that we have largely detailed above, it is obvious that Dudley has a substantial interest in her degree: The revocation of a degree that has already been publicly awarded is perhaps the most dramatic and far-reaching discipline that a university can impose on one of its students.

Nonetheless, BSU argues that Dudley's constitutional interest in her degree was equivalent to her interest in her SOCWRK 481 grade because Dudley needed to pass SOCWRK 481 to graduate. There is some logic to BSU's position—if Dudley failed to pass SOCWRK 481, she likewise failed to satisfy the requirements for graduation, and she should not have been awarded her diploma. But this linear reasoning equating a grade in a required course to a resulting degree would make that degree only as "important" as any of an alumna's underlying grades, assignments, exam answers, or other academic prerequisites. And such an argument commits the fallacy of continuum, because it cannot distinguish between the grade and the degree. BSU, like every other American university, surely lavishes students with praise and regales them with "Pomp and Circumstance" when they graduate; we doubt that it does so whenever they pass SOCWRK 481 or turn an assignment in on time. At graduation, BSU awards students with diplomas that attest to their academic achievement; we doubt that it doles out any equivalent recognition for earning a "B+" or writing a good exam answer. BSU's degrees represent far

more than any grade in one class.  Dudley's interest in her degree was substantial, and it far outstripped her interest in her SOCWRK 481 grade.  That means that we should not undervalue Dudley's BSU degree by focusing on her grades.

More importantly, we reiterate that a BSU degree, unlike a grade in a single class, has collateral value.  It is the gateway to licensure as a social worker in Idaho.  Without "a baccalaureate degree in social work from a college or university," such as BSU, Dudley is not eligible to be a social worker.  Idaho Code § 54-3206(3).  Dudley has strong interest in retaining her degree, and that gives her a strong interest in seeing that she has a full and fair opportunity to contest any charges before BSU strips her of her diploma.

b.  BSU's interest in revoking Dudley's degree

BSU obviously had its own significant interest in the outcome of any decision to revoke Dudley's degree:  the integrity of its degrees was at stake.

BSU argues that, because it revoked Dudley's degree for "academic," rather than "disciplinary reasons" it "need not hold a hearing."  As the Supreme Court has observed, there is a "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct.  This difference calls for far less stringent procedural requirements in the case of an academic dismissal."  *Horowitz*, 435 U.S. at 86.

But we do not think that Dudley's degree revocation implicates BSU's "constitutional right to academic freedom."  As *Horowitz* explained, "[a]cademic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached

a full-hearing requirement."  435 U.S. at 89.  BSU did not revoke Dudley's degree over a purely "academic" dispute about whether her course work was deserving of an "A" or a "C," or whether she exhibited sufficient care in her personal appearance to meet the requirements for interacting with patients in a lab. *Cf. id.*  Those questions involve the kind of academic judgment that is "not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* at 90; *see al-Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355, 360 (6th Cir. 2015); *Brown v. Li*, 308 F.3d 939, 954 (9th Cir. 2002); *Hennessy v. City of Melrose*, 194 F.3d 237, 250–51 (1st Cir. 1999).

By contrast, BSU conducted an affirmative "investigation" into whether Dudley violated "state and federal privacy laws," among other rules.  This makes BSU's revocation decisions seem "disciplinary" rather than based on Dudley's mere failure to satisfy academic standards. Additionally, Dudley's alleged misconduct occurred during an off-campus practicum in which she was supervised and evaluated by IDHW employees, not BSU professors. Moreover, BSU asserted that Dudley violated professional ethical norms that applied to *both* IDHW employees and BSU's social work students.  Had Dudley been a full-time employee whom IDHW fired for cause, we have little doubt that she could have requested both administrative and judicial review of the claim that she had violated IDHW rules when she viewed confidential files without authorization.  That claim would be appropriate for judicial review.

BSU has an additional interest here that cannot be easily classified as "academic" or "disciplinary": its relationship with IDHW.  The record does not disclose how many BSU students accept internships at IDHW or other state or

municipal agencies.  If IDHW loses confidence in BSU's programs because, for example, BSU students are allowed to commit ethical violations with academic impunity, it might decline to accept future BSU interns.  Having been notified by IDHW of Dudley's misconduct, BSU was obligated to respond, even though Dudley's misconduct occurred while she was under IDHW's, not BSU's, direct supervision.

Nevertheless, we think that BSU's broader reputational concerns weigh in favor of resolving disputes like Dudley's properly, and not just expeditiously.  Given the rarity of degree revocation and the centrality of conferring degrees to BSU's mission, this was not a decision that BSU could take lightly.  BSU, which has more than 20,000 degree-seeking students,[4] also has an interest in not arbitrarily denying or revoking students' diplomas.  Surely, imposing arbitrary discipline would do more to harm than to preserve BSU's reputation.

We have little difficulty concluding that BSU has a strong interest in accurately resolving the charges against Dudley, and that the charges against her, despite having an academic component, are primarily disciplinary in nature.

c. The process due and the risk of error

We have determined that both Dudley and BSU have a strong interest in accurately resolving the charges against Dudley.  *See Goss*, 419 U.S. at 579–80.  Having reached this conclusion, we turn to "[t]he final, and perhaps most important, *Mathews* factor," which is "the risk of erroneous deprivation and the probable value of additional procedural

---

[4] *See* Boise State University, *Facts and Figures - About Boise State*, https://www.boisestate.edu/about/facts/ (last accessed August 26, 2025).

safeguards. As we evaluate this factor, we ask 'considering the current process, what is the chance the [university] will make a mistake?'" *Humphries v. Cnty. of L.A.*, 554 F.3d 1170, 1194 (9th Cir. 2009), *rev'd in part on other grounds*, 562 U.S. 29 (2010). Dudley challenges separately the two decisions BSU made to revoke her degree. We consider BSU's first revocation of Dudley's degree, and then BSU's second revocation of Dudley's degree following its conduct hearing.

BSU first revoked Dudley's degree in November 2022 by sending her two letters. The first letter, signed by Interim Dean Tony Roark, informed Dudley that BSU retroactively changed her SOCWRK 481 grade from passing to failing, and that this rendered her transcript "invalid." The second letter, which was signed by BSU Registrar Mandy Nelson, and which came the next day, informed Dudley that BSU had "rescinded" her degree because she no longer satisfied the requirements for graduation. A week later, and only *after* BSU told her it had revoked her degree, Assistant Dean Kate Law advised Dudley that BSU would hold a "conduct hearing."

Dudley argues that she was entitled to notice and a hearing before BSU revoked her degree. Given each side's substantial interest in accurately resolving this dispute, we agree that BSU should have given Dudley prior notice of its intent to revoke her degree and an opportunity to contest the potential revocation. *See Boddie v. Connecticut*, 401 U.S. 371, 378–79 (1971) (emphasizing the "root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."). BSU's belated decision to provide Dudley with a hearing *after* it first revoked her degree suggests that it recognized its error and attempted to rectify it. Although Dudley obtained a

TRO to prevent the December 2022 hearing, BSU eventually provided her with a hearing in February 2023. This subsequent hearing mooted Dudley's equitable claims stemming from her first degree revocation. *See Ming Kuo Yang v. City of Wyoming*, 793 F.3d 599, 604 (6th Cir. 2015) ("Post-hearing notice alone may satisfy due process so long as the interested party still has another meaningful opportunity for a hearing. The subsequent hearing 'cure[s]' any lack of notice . . . .") (alteration in original) (citations omitted); *Walker v. City of Berkeley*, 951 F.2d 182, 184 (9th Cir. 1991) (explaining that due process received in a post-deprivation hearing may cure earlier deficiencies).[5]

BSU revoked Dudley's degree again in March 2023 after giving her notice and holding a "conduct hearing" to "review" the "charges" against her. Dudley challenged many aspects of this process before the district court. The district court rejected these challenges and concluded that Dudley was not entitled to any additional procedural safeguards. The district court found that Dudley's "disagreements with the process itself" were "largely immaterial" because "BSU provided notice, an informational meeting and packet, and a hearing." BSU makes a similar argument on appeal, asserting that "Dudley's disagreement with how the hearing was conducted does not mean she was deprived of due process."

On appeal, Dudley challenges nearly every aspect of the "conduct hearing" that preceded her second degree revocation. We will not address all of Dudley's claims, many of which are duplicative or not developed. We instead address Dudley's four potentially viable claims: that (1) she received insufficient notice of the hearing; (2) she was given

---

[5] We discuss Dudley's damages claim in Section III.C.

insufficient time to present her case at the hearing; (3) she was not allowed to cross-examine BSU's principal witness, Law; and (4) BSU violated the separation of functions when Law was in the room with the Student Conduct Board deciding Dudley's case.

(1) *Insufficient notice.*   Due process requires that the government provide notice that "give[s] the charged party a chance to marshal the facts in his defense and . . . clarif[ies] what the charges are, in fact." *Wolff v. McDonnell*, 418 U.S. 539, 564 (1974).   Dudley argues that BSU denied her due process by failing to provide her with adequate notice of the "specific underlying policies or laws" that she allegedly violated.  However, BSU provided Dudley with at least three written notices that apprised her of the violation and the consequences.  First, Law sent Dudley a letter on November 10, 2022, that identified the provision of the Student Code of Conduct that BSU accused Dudley of violating; summarized the IDHW investigation; scheduled the first conduct hearing; and offered a pre-hearing meeting.   Second, Raymond Mullenax, BSU's Director of Field Education, sent Dudley a letter on December 1, 2022, that enumerated specific NASW Code of Ethics standards and BSU local policies that BSU believed Dudley violated.  Finally, Law sent Dudley a new notice of hearing on January 9, 2023, that repeated the information in the November 10, 2022, letter.  These letters fully advised Dudley of the grounds for discipline, the facts supporting the charge, and the consequences for her alleged conduct.   If there was any remaining ambiguity, Dudley should have requested clarification or a meeting with Law, as Law offered in her initial letter.  BSU provided fair notice.

(2) *Insufficient time to present her case.*  In discussions prior to her February 2023 hearing, Dudley objected that BSU would only provide her with ten minutes to present her

case, ten minutes to question witnesses, and five minutes for summation. She allegedly requested 45 minutes to present her case, 25 minutes to question each witness, and 45 minutes for summation. Dudley alleges that she in fact had 25 minutes for her defense, thus "substantially complying" with the time restrictions for the hearing—this was her first meaningful opportunity to challenge the evidence against her.[6]

We have no firm principles for prescribing time limits for such a hearing. The lack of quantifiable standards notwithstanding, Dudley's alleged ten-minute time allotment for presenting her case, plus ten minutes for questioning witnesses and five minutes for summation, strikes us as unreasonably restrictive. Dudley's allegations imply that she in fact received more than ten minutes to present her case given that she had a total of twenty-five minutes and she was unable to question any witnesses. But going into the hearing, she would have been aware of BSU's harsh time constraint and had to prepare accordingly. For all the reasons we have described above, this was a serious hearing, with much at stake for both Dudley and BSU. We recognize that an administrative body such as the Student Conduct Board must be able to control its own proceedings, including the time allowed for the parties' presentations. The board retains discretion to determine, for example,

---

[6] BSU's Student Conduct Board hearing is one piece of an informal administrative process. The charge was summarized in the letters from Roark and Law. Law offered to meet with Dudley to go over the university's process and Dudley's rights and responsibilities. In such a meeting, Dudley might have asked, informally, about the proof against her, but Dudley declined the invitation. As a result, the Student Conduct Board was Dudley's first real opportunity to challenge the evidence against her.

whether a party's perspective has been fully and fairly aired and any further evidence would be duplicative. We will not prescribe a time for Dudley's presentation but expect that BSU will offer Dudley a more reasonable time for her presentation in any new proceeding.

(3) *Cross-examination.*    Dudley alleges that BSU violated her due process right by allowing "witnesses to present written testimony" at her hearing "without being subjected to cross-examination." The DOS Complainant to the Student Conduct Board allegedly presented three relevant pieces of evidence: a sworn affidavit from IDHW's Mike Dixon, a letter from BSU's Raymond Mullenax, and the investigative report prepared by Law. Dudley alleged that Dixon and Law declined her requests to appear at her hearing in person. Dudley also alleges that she decided against trying to examine Mullenax.

Cross-examination is an important procedural safeguard. "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg*, 397 U.S. at 269. In American adversarial proceedings, "[c]ross-examination has always been considered a most effective way to ascertain truth." *Watkins v. Sowders*, 449 U.S. 341, 349 (1981) (footnote omitted); *see also Black Coal. v. Portland Sch. Dist. No. 1*, 484 F.2d 1040, 1045 (9th Cir. 1973) (suggesting that a school district could not expel high school students without allowing them to "cross[-]examine adverse witnesses"). Not every hearing requires live testimony, and not every live witness must be subjected to cross-examination. But where a "university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-

examination in order to satisfy due process." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).

We hold that Dudley has a due process right to ask questions to adverse witnesses affiliated with BSU—and, in particular, Law. Law does not have first-hand knowledge of Dudley's conduct; that witness would be Dixon, who declined to testify in person but submitted a sworn statement.[7] Yet Law's investigation is the foundation for BSU's complaint, and Dudley should be able to question her about the people she spoke with, the evidence she gathered, and her diligence in establishing the facts. Without the ability to question Law, Dudley can only proffer her own account of the events; that testimony is critical to her defense, of course, but an opportunity to testify in her own defense is not the same as being able to probe the strength of the university's case against her.

BSU and Dudley have a shared interest in reaching the truth. BSU does not further its institutional interests by erroneously revoking a diploma. We can see little burden to BSU to make Law available for questioning since she was already present at Dudley's hearing. It is surely not a severe "fiscal and administrative burden[]" that BSU has a strong interest in avoiding. *See Mathews*, 424 U.S. at 335. Although Law's primary task was *investigating* Dudley, Law allegedly created an evidentiary "hearing packet" that "included documents that [Law] had drafted" herself. Law thus plausibly acted as a witness, in addition to a prosecutor (and, possibly, an adjudicator) in Dudley's case. Because Law was intimately involved in Dudley's case, we conclude

---

[7] We decline to hold that due process required BSU to procure a subpoena or otherwise compel unaffiliated witnesses such as Dixon to be available for questioning.

that making her available for questioning would substantially reduce the likelihood of "erroneous deprivation." *See Eldridge*, 424 U.S. at 335.

We recognize that requiring BSU to permit cross-examination in this case makes the proceeding more formal in nature, but it does not convert the proceeding into a formal hearing. Informal administration proceedings, even where cross-examination is permitted, are not subject to the same rules we follow in formal judicial proceedings. In particular, the proceedings are not subject to the rules of evidence. *See Fairbank v. Hardin*, 429 F.2d 264, 267 (9th Cir. 1970) ("Of course, the technical rules of evidence, applicable in civil trials, are not employed in administrative hearings."). We do not mandate the exact form that cross examination must take, but we do hold that due process in this context means permitting Dudley to probe the university's case by putting questions to Law.

(4) *Separation of functions.* Finally, Dudley argues that BSU denied her due process by permitting Law to both investigate and adjudicate her case. Specifically, she alleges that "[a]t the conclusion of the hearing, Ms. Dudley left, and Defendant Law remained with the Student Conduct Board as they deliberated." In administrative boards, "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation . . . ." *Withrow v. Larkin*, 421 U.S. 35, 58 (1975). Indeed, "[i]t is . . . very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure . . . does not violate due process of law." *Id.* at 56 (footnote omitted); *see Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 567 (6th

Cir. 2011) ("[D]ue process is not necessarily violated when the school official who initiates, investigates, or prosecutes charges against a student plays a role in the decision to suspend the student." (citations omitted)); *Humphries*, 554 F.3d at 1197 (declining to adopt the proposition that decisionmakers "who participate in an investigation are disqualified from adjudicating" (citation omitted)). We cannot conclude that Law's alleged presence in the room with the Student Conduct Board violated Dudley's due process rights.

Dudley also argues that BSU denied her due process by adopting Law's Investigation Report in its ultimate findings.[8] But BSU's alleged adoption of the Investigation Report, *per se*, did not deny Dudley due process. *See Midland Banana & Tomato Co., Inc. v. U.S. Dep't of Agric.*, 104 F.3d 139, 142 (8th Cir. 1997) (determining that a litigant "considerably overplay[ed] his hand by suggesting that any uniform adoption of one party's proposed findings signifies 'bias' and supports a conclusion that there has been a due

---

[8] Dudley also argues that Law's allegedly biased *investigatory* actions denied her due process. Dudley makes a litany of claims: She alleges that Law adopted allegations from Roark's letter revoking Dudley's degree; failed to interview Dudley or witnesses she asserted were relevant; "withheld, mischaracterized, altered, and fabricated evidence against Dudley;" included irrelevant assertions that "cast Dudley in a poor light;" and investigated Dudley only to ratify Roark's initial revocation of Dudley's degree. Yet due process does not guarantee an unbiased *investigation.* Instead, "[t]he mere fact that [certain] charges may be unfair or untrue does not give rise to a Constitutional claim: 'The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised [] decisions.'" *Portman*, 995 F.2d at 908 (quoting *Bishop v. Wood*, 426 U.S. 341, 350 (1976)). If Dudley thinks the investigation has been in error, the hearing before the Board is Dudley's opportunity to set the record straight.

process violation."). The Student Conduct Board reviewed the evidence and reached a conclusion, and that conclusion is entitled to a presumption of regularity. As "policymakers with decisionmaking power," Student Conduct Board members enjoy a "presumption of honesty and integrity," and even "[a] showing that the Board was 'involved' in the events preceding [its] decision . . . is not enough to overcome [that] presumption." *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 496–97 (1976).

Dudley's objections to Law's investigation, her complaint that Law remained a part of the decisionmaking process, and her claim that the Board agreed with Law's conclusions are, without more, not founded in the Due Process Clause.

\* \* \*

We conclude that BSU's first revocation of Dudley's degree without any notice or hearing deprived her of due process. And, on balance, we further conclude that BSU's alleged artificial restrictions on Dudley's time for presenting her case and its alleged refusal to allow her to examine BSU-affiliated witnesses also deprived her of due process. Both of these decisions go to the heart of the Student Conduct Board's truth-finding function and, thus, given the important interests at stake here, we conclude that those procedures created an unacceptable risk of an erroneous result.

By contrast, we conclude that Dudley failed to plausibly allege that BSU violated due process by giving her insufficient notice prior to her conduct hearing, or by allegedly allowing Law to remain in the room with the Board when it deliberated its decision. We offer no views on the merits of BSU's dispute with Dudley and hold only that

Dudley properly pleaded that certain elements of BSU's process were inadequate. Insofar as the district court dismissed Dudley's claim stemming from BSU's alleged failure to provide Dudley with sufficient time to present her case or directly or indirectly cross-examine witnesses, we reverse the district court.

## B. *Substantive Due Process Right to an Occupation*

We next consider whether Dudley plausibly alleged that Defendants violated her Fourteenth Amendment substantive due process right to pursue an occupation in social work. We agree with the district court that Dudley failed to state a claim. *Dudley*, 732 F. Supp. 3d at 1284.

The Supreme Court has acknowledged that "the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999). That right "is nevertheless subject to reasonable government regulation." *Id.* The contours of this generalized right, however, have not been clearly set forth, either by the Supreme Court or by our court. In *Engquist v. Oregon Department of Agriculture*, 478 F.3d 985, 997 (9th Cir. 2007), we held that "a plaintiff can make out a substantive due process claim if she is unable to pursue an occupation and this inability is caused by government actions that were arbitrary and lacking a rational basis."

However, we have only recognized occupational liberty claims in "extreme cases, such as a 'government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license of an individual in an occupation that

requires licensure.'"  *Id.* at 997–98 (quoting *Olivieri v. Rodriguez,* 122 F.3d 406, 408 (7th Cir. 1997)).  "[I]n order to bring an occupational liberty claim, a plaintiff must show that the 'character and circumstances of a public employer's stigmatizing conduct or statements are such as to have destroyed an employee's freedom to take advantage of other employment opportunities.'" *Id.* at 998 (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 531 (7th Cir. 2000)).  This standard "ensures that substantive due process protects the right to pursue an entire profession, and not the right to pursue a particular job." *Id.*

We dealt with the *Engquist* standard more recently in *Armstrong v. Reynolds*, 22 F.4th 1058 (9th Cir. 2022).  In that case, Armstrong alleged that she suffered "'a loss of 13 years of future employment, . . . loss of a clean employment file, and loss of a neutral recommendation to possible future employers.'"  *Id.* at 1081 (omission in original).  We held that this was insufficient to survive a motion to dismiss.  She could not allege facts that would show that the defendants engaged in "conduct rising to the level of a government blacklist or the revocation of a license to practice a particular profession." *Id.*

Here, Dudley has not alleged that BSU subjected her to anything resembling a "government blacklist."  *See id.* Instead, Dudley makes a barebones argument that "BSU arbitrarily revoked her BSW degree without due process and informed [the Idaho Division of Occupational and Professional Licenses] so that Dudley would lose her BSW license—making her unable to pursue her chosen occupation."  Dudley further argues that it can be "reasonably inferred that Appellees' intent behind revoking Dudley's course credit and BSW degree, and expelling her, was to prevent her from being eligible for a BSW license."

We reject Dudley's argument for two reasons.  First, BSU's decision to revoke Dudley's degree and report that revocation to the Idaho Division of Occupational and Professional Licenses, while procedurally infirm, was not substantively "arbitrary and lacking a rational basis," given the severity of IDHW's allegations.  *See Engquist*, 478 F.3d at 997.  Any conclusion to the contrary would risk subjecting all professional licensure schemes and professional education program enrollment decisions to arbitrary-and-capricious review.  *See Aka v. United States Tax Court*, 854 F.3d 30, 35 (D.C. Cir. 2017) (concluding that there is no "substantive due process right to bar membership or against unduly harsh disbarment").

Second, as BSU observes, even if Dudley's allegations were true, she has not alleged that she is unable to pursue a career in the broader social work profession without a license or degree, and she never alleged that she cannot pursue a social work education elsewhere.  Dudley thus failed to allege that BSU's revocation of her degree was anything more than a "brief interruption" in her social work career, much less "a complete prohibition of the right to engage in a calling."  *See Engquist*, 478 F.3d at 997 (citation omitted).  We therefore agree with the district court that Dudley failed to state a claim that BSU deprived her of an occupational liberty interest.

## C.  *Qualified Immunity*

The district court dismissed Dudley's claims to the extent they seek monetary relief, concluding that even if Dudley had alleged a due process violation, Defendants are protected by qualified immunity.  *Dudley*, 732 F. Supp. 3d at 1287–89.  Dudley argues this was error because ISBOE Policy § III.B.2.iii.3 requires that BSU give students "due

process" and hold them accountable "using academic standards and institutional procedures." Although we have concluded that Dudley sufficiently alleged that BSU denied her due process when it revoked her degree following a deficient hearing, we affirm the district court's decision that Defendants are protected by qualified immunity because they did not violate any clearly established right.

"Public officials are immune from suit [for damages] under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (citation omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Dudley cites no caselaw that establishes that a university's analogous conduct violated a graduate's rights under the Due Process Clause of the Fourteenth Amendment. Even though Dudley plausibly alleged that Defendants *did* deprive Dudley of her degree with insufficient process, "[a] procedural due process analysis that requires a complicated balancing test is sufficiently unpredictable" such that it was not clearly established that BSU was required to provide Dudley with certain procedural protections. *See Humphries*, 554 F.3d at 1202.

D. *Preliminary Injunction*

Finally, we dismiss as moot Dudley's appeal of the district court's 2022 denial of a TRO extension, which we construe as denial of a preliminary injunction. *See Washington v. Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017) (treating "an order styled as a TRO" as a preliminary

injunction when the order "was strongly challenged in adversarial proceedings before the district court and [] it has or will remain in force for longer than [a] fourteen-day period"); *Barbaria v. Blinken*, 87 F.4th 963, 976 (9th Cir. 2023) (treating a "denial of a TRO" as "tantamount to the denial of a preliminary injunction" (citation omitted)); *see also Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2013).

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's dismissal of Dudley's procedural due process claim insofar as Dudley alleged that Defendants denied her due process by not allowing her sufficient time to present her defense and by refusing to allow her to cross-examine or otherwise question adverse BSU-affiliated witnesses at her conduct hearing, and we **REMAND** for further proceedings consistent with this opinion. We **AFFIRM** the district court's dismissal of Dudley's substantive due process claim. We **AFFIRM** the district court's judgment granting qualified immunity to the Defendants as to Dudley's claims for monetary relief. Finally, we **DISMISS** Dudley's appeal of the district court's denial of a preliminary injunction.

Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, DISMISSED IN PART, and REMANDED.**